Ann E. BUBLITZ and Dorothy A. Pierce, Individually and on Behalf of Themselves and All Persons Similarly Situated, Plaintiffs,

v.

E.I. DUPONT DE NEMOURS AND COMPANY and Pioneer Hi–Bred International, Inc., Defendants.

Jeanne Foster, Plaintiff,

v.

E.I. duPont de Nemours and Company and Pioneer Hi–Bred International, Inc., Defendants.

William Pennington, Plaintiff,

v.

E.I. duPont de Nemours and Company and Pioneer Hi–Bred International, Inc., Defendants.

Nos. 4–00–CV–90247, 4:00–CV–90286, 4:00–CV–90375.

United States District Court, S.D. Iowa, Central Division.

Aug. 27, 2002.

Frank B. Harty, Michael W. Thrall, Gerald J. Newbrough of Nyemaster Goode Voights West Hansell & O'Brien, Des Moines, IA, Larry S. Pozner, Denver, CO, for Plaintiffs.

John B. Gordon, Brian Melendez, Steven L. Severson of Faegre & Benson, Minneapolis, MN, Michael A. Giudicessi, Faegre & Benson, Des Moines, IA, for Defendants.

## ORDER

PRATT, District Judge.

The Court has before it Plaintiffs' Combined Application for Award of Attorneys'

Fees and Expenses. After settling the merits of this lawsuit, the parties undertook an abbreviated proceeding concerning attorneys' fees and expenses. That proceeding involved initial briefs, limited discovery, a three day hearing, and post-hearing briefs. The matter is now fully submitted. For the following reasons, the Court grants Plaintiffs' motion in part and denies it in part.

## I. BACKGROUND

Plaintiffs' combined motion is based on three lawsuits against Defendants Pioneer Hi–Bred International, Inc. ("Pioneer")[1] and E.I. duPont de Nemours and Company ("DuPont"). The first suit was a class action brought by Plaintiffs Ann Bublitz and Dorothy Pierce on April 21, 2000. In that suit, they sought to represent themselves as well as 263 other Pioneer employees who were similarly situated with respect to the benefit plan at issue. The complaint alleged four counts under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*: Count I was a claim for enforcement and declaration of plan benefits against Pioneer and DuPont; Count II was a breach of fiduciary duty claim against Pioneer and DuPont; Count III was a claim against DuPont for interference with protected rights; and Count IV was an equitable relief claim against Pioneer and DuPont asking the Court to toll the three-year period during which participants are entitled to exercise their rights under the plan for the pendency of this action. The other two suits were brought by Jeanne Foster and William Pennington individually, both alleging ERISA claims with respect to the benefit plan. But it is the class action that is at the heart of the dispute here.

The benefit plan at issue in these cases is called the Change in Control Severance Compensation Plan for Management Employees ("CIC" Plan). It was created by Pioneer at least in part to protect itself from the adverse effects of attempted takeovers. To that end, the CIC Plan provides generous severance benefits in the event of a takeover in order to encourage people to work in an environment where takeover threats are real. Benefits consisted of three times a participant's annual compensation, plus health, dental, and life insurance coverage for twelve months.

On October 1, 1999, DuPont took over Pioneer and effected a Change in Control as that term is defined in the CIC Plan. More than just a Change in Control, however, was necessary to trigger benefits under the CIC Plan. The plan participant also must be subject to an involuntary termination within three years of the Change in Control.

The CIC Plan defines involuntary termination as either a termination other than a termination for cause, or the participant's resignation or retirement for a "Stated Good Reason." Under Section 2.1(t) of the CIC Plan, a "Stated Good Reason" is "a written determination by a participant that he [or she] reasonably and in good faith cannot continue to fulfill responsibilities for which he [or she] was employed." Plaintiffs refer to this as a "subjective" trigger. The plan also identifies a number of specific actions by Pioneer that give rise

---

1. Much was made in this case about the philosophy of Pioneer. That philosophy was, of course, attributed to the late Henry A. Wallace, who, along with being the founder of Pioneer was also the United States Secretary of Agriculture, Secretary of Commerce and Vice President of the United States. With that, the recent book on Henry Wallace's life, *American Dreamer*, was also given attention in this lawsuit. This wonderful book on the life of a great Iowan was co-authored by another great Iowan, former United States Senator John C. Culver. *See* John C. Culver and John Hyde, *American Dreamer* (W.W. Norton & Co., Inc.2000).

to a conclusive presumption that the participant's determination is reasonable and in good faith, which Plaintiffs refer to as "objective" triggers. These objective triggers include the following: (a) a reduction in the participant's base salary; (b) a failure to continue in effect any bonus plan; (c) a failure to continue any benefit or compensation plan; (d) an assignment to the participant of any duties inconsistent with the participant's duties, responsibilities, or status immediately prior to the Change in Control, or changes in the participant's reporting responsibilities, title, or office; and (e) a requirement that the participant change the location of his or her job or office, so that the participant will be based more than 30 miles away from where he or she was based. The meaning of "Stated Good Reason" and whether it had been triggered was the basis of Plaintiffs' enforcement of plan benefits claims.

Claims for CIC Plan benefits had to be made in writing to the Severance Committee. Participants then had the ability to appeal the decision of the Severance Committee to the Authorization Committee. The composition and conduct of these committees was the basis for Plaintiffs' breach of fiduciary claims.

Finally, and most significantly for purposes of this matter, the CIC Plan contained an attorney fee provision. Section 9.1 of the CIC Plan states: "The Company shall pay all legal fees, costs of litigation, and other expenses incurred by each Participant or the Participant's beneficiary as a result of the Company's contesting the validity, enforceability or interpretation of the Plan." This provision serves as the basis for some of Plaintiffs' counsel's arguments on the matter currently before the Court.

Before the Court certified the class action, Defendants offered the CIC participants a "Retention Proposal." As indicated by its name, the Retention Proposal was designed to provide participants with an incentive to remain at Pioneer. It offered each participant a stock option grant valued at three times the employee's total compensation as of October 1, 1999. The options would then become vested on October 1, 2002, if the employee was still employed by Pioneer. In exchange for the stock options, participants had to waive their rights under the Change in Control Plan, accept a new Transitional Severance Plan (which provides benefits in certain circumstances when an employee suffers an involuntary termination before his or her stock options vest wherein the definition of "involuntary termination" is narrower than that in the Change in Control Plan), and agree not to participate in litigation regarding the Change in Control Plan. Although there was some dispute regarding the manner in which Defendants could communicate such an offer, the Court eventually allowed Defendants to present the Retention Proposal directly to the proposed class members, but only in writing. In addition, the Court required Defendants to file all communications regarding the Retention Proposal with the Court and required them to give the participants at least ten days to consider it. Defendants presented the Retention Proposal to the putative class members on September 29, 2000 and gave them until October 18, 2000 to accept it.

Approximately 84% of the putative class accepted the Retention Proposal. The class size was further reduced by employees who applied for and received CIC benefits before the Retention Proposal and employees who refused to sign the Retention Proposal but were then able to apply for and receive CIC benefits. On July 25, 2001, the Court certified a class of seventeen people defined as follows:

> Pioneer Pay Band III and Pay Band IV employees who were, as of April 21,

2000, the date this action was filed, "Employees" as defined in Section 2.1(i) of the Pioneer Hi–Bred International, Inc. Change in Control Severance Compensation Plan For Management Employee ("Change in Control Plan" or "Plan"), excluding persons who signed the Retention Proposal and persons who received full Change in Control Plan benefits (including attorney fees and costs).

The Court designated Pierce and Robert D. York as class representatives. Bublitz applied for and received CIC benefits before the class certification, and withdrew as a class representative, though she still remained as a member of the class claiming entitlement to attorneys' fees and costs. Pierce, who had applied for benefits at the time of certification, received benefits before the case was settled. Class representative York had already applied for and had been denied benefits. As class counsel, the Court designated Frank B. Harty, Gerald J. Newbrough, Michael W. Thrall, Julie M. Williamson, Daniel M. Reilly, and Larry S. Pozner. Plaintiff York was also represented individually by Michael J. Carroll.[2]

The parties settled all three lawsuits on March 11, 2002. By this time the class consisted of only nine unnamed class members, plus York, Pierce, and Bublitz. The settlement resulted in Defendants agreeing to pay all of the CIC benefits of the unnamed class members, almost all of York's CIC benefits, and all of the CIC benefits for Pennington and Foster. This amounts to $7,524,943.40. An addendum to the settlement figure is that the CIC benefits of the unnamed class members will not actually be paid unless and until they choose to leave Pioneer. Throughout these proceedings, however, the Court has presumed an intent to leave for those who refused to sign the Retention Proposal. To their credit, Plaintiffs did not negotiate attorneys' fees and costs as part of the settlement on the merits, but instead chose to seek fees and expenses in a separate proceeding.

## II. DISCUSSION

Plaintiffs' counsel identify two bases for an award of attorneys' fees and expenses. The first basis Plaintiffs' counsel identifies is the $113 million[3] in benefits received by the Retention Proposal signers. The second basis identified by Plaintiffs' counsel is the Plaintiffs' and class members' claims. Defendants argue that Plaintiffs' counsel are not entitled to anything with respect to the Retention Proposal, and that the fees and expenses they seek for the Plaintiffs' and class members' claims should be reduced. In addition, Defendants argue that Plaintiffs' counsel's request for attorneys' fees and expenses should be denied in its entirety, or that, if awarded anything, Plaintiffs' counsel are not entitled to prejudgment interest on their fees. Before beginning an extensive discussion and analysis of the lawyers' request for fees and expenses, it is important to note that at the outset of the hearing the Court inquired of all Plaintiffs' counsel if any of them had ever had their fees established by a Court before the pending request. All of the lawyers indicated that their fees had never been decided by a Court in a fee setting proceeding. The record shows the Plaintiffs' Des Moines lawyers are described by themselves as primarily a "defense" firm and Plaintiffs' Denver lawyers are a firm established some six weeks before this lawsuit was filed. It is fair to

---

**2.** Carroll only seeks attorney's fees for the representation of York on his individual claim.

**3.** Defendants have stipulated that the value of the benefits given to the Retention Proposal signers is $113 million.

say that they are accomplished and experienced lawyers whose ability to adequately represent the class has previously been determined by the Court.

## A. Defendants' Request to Deny Plaintiffs' Motion in its Entirety

Defendants argue that because of the extreme and excessive nature of Plaintiffs' counsel's fee request, the Court should refuse to grant them any attorneys' fees and expenses. Defendants cite, as an example, *Brown v. Iowa*, 152 F.R.D. 168, 175 (S.D.Iowa 1993). In that case, then-Magistrate Judge Bennett noted that "[i]f, as appellant argues, the Court were required to award a reasonable fee when an outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be a reduction of their fee to what they should have demanded in the first place." *Id.* at 175. *According to Coop. Fin. Ass'n, Inc. v. Garst*, the way to deter that type of conduct is to deny the entire request. 927 F.Supp. 1179, 1187 (N.D.Iowa 1996) ("an intolerably inflated fee request justifies a complete denial of fees") (quoting *Brown*, 152 F.R.D. at 175) (Bennett, J.). While the Court agrees with this reasoning, it does not think that this case warrants such a measure.

## B. Retention Proposal Fees

Plaintiffs' counsel argues that they are entitled to fees with respect to the Retention Proposal under the common fund doctrine because they were the cause of the Retention Proposal, which created a fund of $113 million. Plaintiffs' counsel do not seek a portion of that fund, though. Instead, Plaintiffs' counsel argues that the portion of the fund to which they would be entitled has shifted to the Defendants under either the bad faith exception to the American Rule or Section 9.1 of the CIC Plan. Plaintiffs also argue that they are entitled to fees with respect to the Retention Proposal under the common benefit doctrine because of the substantial benefit received by Defendants' stockholders due to the Retention Proposal. Defendants argue that neither doctrine is applicable to this case, and that, in any event, Plaintiffs' counsel cannot recover fees with respect to the Retention Proposal because the Supreme Court has recently abolished the catalyst theory.

### 1. The Common Fund Doctrine

■ The Court interprets the Supreme Court's recent decision in *Buckhannon Board and Care Home v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001), as abolishing the catalyst theory with respect to the common fund doctrine. It is true that the precise issue addressed by the Court in *Buckhannon* is whether the term "prevailing party" includes a party who has prevailed under the catalyst theory. *Id.* at 610, 121 S.Ct. 1835. This Court, however, holds that the broader import of that ruling is not limited to the term "prevailing party."

In *Buckhannon*, a company filed a lawsuit alleging that a state statute violated federal law because it discriminated against persons with disabilities. *Id.* at 600–01, 121 S.Ct. 1835. While the suit was pending, the West Virginia legislature amended the statute to delete the offending provision. *Id.* at 601, 121 S.Ct. 1835. The district court dismissed the case as moot, and the company moved for an award of attorneys' fees under the Fair Housing Amendments Act, 42 U.S.C. § 3601 *et seq.*, and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*—both of which provide for the award of attorneys' fees to a "prevailing party." *Id.* As described by the Court: "Petitioners argued that they were entitled to at-

torneys' fees under the 'catalyst theory,' which posits that a plaintiff is a 'prevailing party' if it achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." *Id.*

The Supreme Court rejected plaintiffs' claim, holding that they were not entitled to fees even assuming the lawsuit triggered the amendment, because attorneys' fees are not appropriate unless some judicial determination compelled the change in conduct. *Buckhannon Board and Care Home,* 532 U.S. at 605, 121 S.Ct. 1835. In order to be a "prevailing party" entitled to an award of attorneys' fees, the Court held, there must be a judicially sanctioned change in the legal relationship of the parties. *Id.* The Court stated that a "defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change." *Id.* at 605, 121 S.Ct. 1835. The Court went on to state that it has "never awarded attorneys' fees for a non-judicial 'alteration of actual circumstances.'" *Id.* at 606, 121 S.Ct. 1835 (citation omitted).

The Supreme Court based its holding not only on a parsing of the term "prevailing party," but also on pragmatic concerns. It stated:

> We have ... stated that "[a] request for attorney's fees should not result in a second major litigation" ... Among other things, a "catalyst theory" hearing would require analysis of the defendant's subjective motivations in changing its conduct, an analysis that "will likely depend on a highly factbound inquiry and may turn on a reasonable inference from the nature and timing of the defendant's change in conduct." Although we do not doubt the ability of the district courts to perform the nuanced "three thresholds" test required by the

"catalyst theory"—whether the claim was a colorable claim rather than groundless; whether the lawsuit was a substantial rather than an insubstantial cause of the defendant's change in conduct; whether the defendant's change in conduct was motivated by the plaintiff's threat of victory rather than threat of expense—is clearly not a formula for "ready administrability."

*Id.* at 609–10, 121 S.Ct. 1835 (citations omitted). Because these pragmatic concerns are present in any catalyst theory case, the Court concludes that the Supreme Court's reasoning was not limited to the application of the catalyst theory to just the term "prevailing party."

A recent North Carolina Appeals Court case addressed whether the catalyst theory is still available under the common fund doctrine. In *Taylor v. City of Lenoir,* 148 N.C.App. 269, 558 S.E.2d 242 (2002), a class of law enforcement officers alleged that the city failed to enroll them in a state-sponsored pension plan that provided more generous benefits than the city's plan. While that lawsuit was pending, the city enrolled sixty-two of the class members in the state-sponsored plan (the "1995 conversion"). The thirty-five class members who were not enrolled continued the lawsuit, which eventually settled for $96,000. *Id.* at 244–45. Class counsel then sought attorney's fees under the common fund doctrine, asking that the court award them not only a portion of the $96,000 in settlement proceeds, but also a percentage of the increased retirement benefits that would be received in the future by the sixty-two class members who had been immediately enrolled by the city. *Id.* at 246.

The Court rejected plaintiffs' counsel's claim. It held as follows:

> [T]he particular benefits from which the class counsel seek attorney's fees (the

increased retirement benefits to those sixty-two plaintiffs who became enrolled in [the state sponsored plan] in 1995) are benefits arising from a "voluntary" action taken by the City—voluntary in the sense that it did not occur as a result of any judicial mechanism of the trial court. The City was not obligated to convert to [the state-sponsored plan] pursuant to any judgment or order entered by the trial court; and, unlike the [settlement proceeds], the benefits resulting from the City's decision to convert to [the state-sponsored plan] did not arise pursuant to a court-approved settlement agreement.

. . . . .

. . . [A]lthough it is possible that this lawsuit may have had some impact upon the City's decision to convert to [the state-sponsored plan] in 1995, the 1995 conversion was not a legally enforceable action required by judgment, or an order or a court approved settlement of the trial court. Thus, we hold that the sixty-two plaintiffs do not qualify as prevailing parties for purposes of awarding attorney's fees.

*Id.* at 247–49. While the Taylor court relied on North Carolina law (although, the Court notes that it did cite *Buckhannon*), the Court nevertheless finds it instructive.

Of course, the first objection that one might pose with regard to following *Taylor* is that it applied North Carolina law, which reads the term "prevailing party" into the common fund doctrine. *Id.* at 278, 558 S.E.2d 242 ("North Carolina cases involving the common fund doctrine indicate that, in order for the common fund doctrine to apply, the party seeking an award of attorney's fees must be the prevailing party, and must show that he has maintained a successful lawsuit."). Certainly, as Plaintiffs' counsel points out, other courts have seen fit to dismiss *Buckhan-*

*non* out of hand because the fee-shifting mechanism before them did not use the term "prevailing party." *See Center for Biological Diversity v. Norton,* 262 F.3d 1077, 1080 n. 2 (10th Cir.2001); *Davenport v. Harry N. Abrams, Inc.,* No. 98 CIV. 8327(LAK), 2001 WL 694574 (S.D.N.Y. June 19, 2001). The Court, however, is not convinced that the term "prevailing party," while admittedly a legal term of art, cannot also be used effectively in the normative sense. The Eighth Circuit has repeatedly inserted the term into its understanding of various fee-shifting mechanisms that do not expressly include it. *See Griffin v. Jim Jamison, Inc.,* 188 F.3d 996, 997 (8th Cir.1999) (stating, in the context of ERISA, "Plaintiff then applied for an award of fees as the prevailing party, which the Court granted."); *Solger v. Wal–Mart Stores, Inc. Assoc. Health and Welfare Plan,* 144 F.3d 567, 569 (8th Cir. 1998) (stating, in the context of ERISA, "We need not address Soger's argument that her award of attorney fees is inadequate, because Solger is no longer a prevailing party entitled to an award of attorney fees."); *Johnson v. HUD,* 939 F.2d 586, 590 (8th Cir.1991) ("a prevailing party cannot recover attorney's fees from a losing party absent express statutory authority or bad faith or unless the litigation involves a common fund or confers a substantial benefit on an ascertainable group."). The point is thus; while the Supreme Court certainly interpreted "prevailing party" as that term is used in federal statutes, it cannot be said that the term is foreign to other fee-shifting mechanisms.

Moreover, the Court can identify no theoretical or public policy reason to distinguish *Buckhannon.* As Justice Ginsburg so aptly articulates in her dissent in *Buckhannon,* there are numerous public policy reasons to allow the catalyst theory under civil rights statutes. *Buckhannon Board*

*and Care Home,* 532 U.S. at 639–40, 121 S.Ct. 1835 (Ginsburg, J., dissenting). Nonetheless, the catalyst theory is not allowed in asserting such important rights. One would be hard pressed then to be able to say that there is any public policy reason to allow the catalyst theory to apply to the common fund doctrine. Similarly, Plaintiffs' counsel has not articulated—nor can the Court imagine—any theoretical or conceptual reason to allow the catalyst theory to apply to the common fund doctrine. The Court, therefore, sees no way around the conclusion that *Buckhannon* foreclosed the use of the catalyst theory in the common fund doctrine.

■  The inapplicability of the common fund doctrine to this case underscores the Court's interpretation of *Buckhannon.* The common fund doctrine "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). "Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit." *Id.;* *see also Linquist v. Bowen,* 839 F.2d 1321, 1323 (8th Cir.1988) ("The common fund theory permits a successful litigant to recover attorney's fees from the fund created by the litigation. The attorney's fees are thus paid proportionately by the non-litigating members of the class."). The common fund doctrine does not apply to this case, because Plaintiffs' counsel are not—and, in fact, cannot—seek a portion of the alleged fund.

The Court has no jurisdiction over the alleged fund created by the Retention Pro-

posal signers.[4]  As mentioned, the common fund doctrine presumes jurisdiction over the fund. Yet there is no argument that the Court has any jurisdiction over the benefits given to the Retention Proposal signers. Once again, *Taylor v. City of Lenoir,* 148 N.C.App. 269, 558 S.E.2d 242 (2002), is instructive. One reason the court refused to award common fund fees with respect to the sixty-two employees who had been voluntarily enrolled in the state plan was the court's lack of control over those benefits:

> Here, the benefits to some of the class plaintiffs resulting from the 1995 conversion are not the result of any judicial action by the trial court in this litigation. The trial court had no opportunity to review these benefits, or to approve or disapprove them, because the 1995 conversion was not undertaken pursuant to a settlement approved by the court. Because these benefits are the result of the City's voluntary action undertaken outside the purview of the trial court, and because the benefits themselves were not subjected to the trial court's review or approval, we do not believe the trial court had sufficient "control" to award attorney's fees from those benefits.

*Id.* at 249. Regardless of Plaintiffs' counsels' attempt to combine the common fund doctrine with other fee-shifting mechanisms, the fundamental underpinning of having jurisdiction over the fund is absent here.

■  Nor can the Court combine the bad faith exception or Section 9.1 of the CIC Plan to the common fund doctrine to make it work. "A court's inherent power to award attorney fees pursuant to the bad faith exception 'depends not on which par-

---

4.  The Court does not reach the question of whether the benefits given to the Retention Proposal signers actually creates a common fund for the purposes of the common fund doctrine.

ty wins the lawsuit, but on how the parties conduct themselves *during the litigation.*" *Lamb Eng'g & Constr. Co. v. Nebraska Public Power Dist.*, 103 F.3d 1422, (8th Cir.1997) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 53, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). In *Lamb Eng'g & Constr. Co.*, the Eighth Circuit stated: "This court has recently adopted the view promulgated by various circuits that, in determining whether to award attorney fees based on the litigant's bad faith, [t]he court may consider conduct both during and prior to the litigation, although the award may not be based solely on the conduct that led to the substantive claim." *Id.* (internal quotations omitted). It would therefore appear that the bad faith exception would actually operate separately from, rather than in conjunction with, another fee-shifting mechanism. Furthermore, the Court finds that Defendants were not guilty of bad faith in this litigation. Thus, the bad faith exception does not apply.

Plaintiffs' counsels' attempt to combine the common fund doctrine with the CIC Plan to shift fees with respect to the Retention Proposal signers gets more to the heart of this dispute. Plaintiffs' counsel are attempting to bootstrap their way into Section 9.1 of the CIC Plan through the common fund doctrine. They essentially argue that because the CIC Plan obligates Defendants to pay for all of the participants' legal fees incurred "as a result of the Company's contesting the validity, enforceability or interpretation of the Plan," their fees need not come out of the common fund, but rather are to be paid by Defendants directly. No matter how sound such an argument may sound at first blush, it is to no avail.

Section 9.1 states that "the Company" (Pioneer) is liable for the fees "incurred by each Participant." The Eighth Circuit has examined fee-shifting language that turns on whether fees were "incurred" or "actually incurred." In *United States v. 122.00 Acres of Land*, 856 F.2d 56, 57 (8th Cir. 1988), the party seeking fees had signed a contingency-fee agreement with his lawyer, which stated that he would "bear no expense for attorneys' fees" if there was no recovery. His case was dismissed before he had recovered any funds, and the Court held that, because this party "had no obligation under the contingent-fee arrangement to pay his attorney anything, he had not 'incurred' attorneys' fees within the meaning of the statute." *Id.* at 58. Later, in *SEC v. Comserv Corp.*, 908 F.2d 1407, 1414 (8th Cir.1990), the Eighth Circuit said that "[t]he lesson of 122 Acres is that fees are incurred when there is a legal obligation to pay them."

Similarly, in *Comserv*, the SEC had sued Comserv and several of its officers. One of those officers ultimately prevailed, and sought an award of attorneys' fees under the Equal Access to Justice Act ("EAJA"). 908 F.2d at 1409–10. The officer seeking fees, however, had not actually paid any legal expenses, because Comserv had paid all of his legal expenses arising in connection with the SEC investigation. *Id.* at 1413. The Eighth Circuit thus found that the officer was not entitled to an award of fees under the EAJA. Noting that, from the start of the SEC investigation, the Comserv officer was able to pursue his defense ... secure in the knowledge that he would incur no legal liability for attorneys' fees, the Eighth Circuit stated that "[t]o hold he 'incurred' such fees is to turn the word upside down." *Id.* at 1414–15.

In this case, the Retention Proposal signers never "incurred" fees because they were never obligated to pay Plaintiffs' counsel fees. They were never obligated to pay Plaintiffs' counsel fees because Plaintiffs' counsel were never entitled to a portion of the alleged fund created by the

Retention Proposal benefits. Although this may sound circular, the result makes sense. If Plaintiffs' counsel were able to bootstrap their way into Section 9.1 this way, Pioneer would be forced to do more than what it contracted for: it would be forced to pay attorneys' fees that were never incurred. Stated differently, Pioneer agreed to pay the participants' fees, not the fees of any attorneys who happened to benefit the participants. Therefore, because the Retention Proposal signers never incurred the attorneys' fees and expenses Plaintiffs' counsel request, the Court cannot obligate the Defendants to pay them.

This underscores the Court's interpretation of *Buckhannon* because, had Plaintiffs' counsel fulfilled the prevailing party requirement, the common fund doctrine would have been much more likely to have applied. If Plaintiffs would have received a judgment or a court-approved settlement with respect to the Retention Proposal benefits, the Court would have at least had jurisdiction over the alleged fund. In any event, the Court holds that Plaintiffs' counsel are not entitled to fees and expenses under the common fund doctrine both because *Buckhannon* precludes it and because the common fund doctrine does not apply to this case in any event.

### 2. The Common Benefit Doctrine

■ The common benefit doctrine is not applicable to this case either. In *Johnson v. HUD*, 939 F.2d 586, (8th Cir.1991), the Eighth Circuit explained the conceptual underpinnings of the common benefit, or substantial benefit, exception. It stated, " '[T]he substantial benefit [exception] begins with the premise that persons directly benefitting from a lawsuit should share the legal expenses incurred by the named plaintiff to avoid unjust enrichment of the absent beneficiaries.' " 939 F.2d 586, 590 (8th Cir.1991) (quoting 1 M. Derfner & A. Wolf, Court Awarded Attorney Fees

¶ 3.01[1], at 3–2). It explained that "[t]he typical substantial benefit case involves either shareholder derivative actions or entities like unions." *Id.* (citations omitted). In either context, the court explained, " 'the class of beneficiaries is before the court in fact or in some representative form.' " *Id.* at 591 (quoting 1 M. Derfner & A. Wolf, Court Awarded Attorney Fees ¶ 3.05[1], at 3–28). It further explained:

> In a shareholder derivative action, the successful shareholder plaintiff confers a substantial benefit on all of the shareholders of the defendant corporation. Any fees assessed against the corporation can be spread proportionately among all of the shareholders, who are the real beneficiaries of the litigation, because the corporation is the alter ego of the shareholders.

*Id.* at 590.

Plaintiffs' counsel argue that it created a substantial benefit for Defendants' stockholders by causing Defendants to settle a $113 million obligation to the Retention Proposal signers in exchange for stock options costing Defendants nothing more than administrative expenses and, at the same time, preserving Pioneer's invaluable intellectual and leadership capital and DuPont's $10 billion investment in Pioneer. This argument is simply untenable. The only ones who benefitted from the Retention Proposal were the ones who signed it. Any holding to the contrary would turn the common benefit doctrine on its head. Because the common benefit doctrine plainly does not apply to this case, the Court need not reach the issue of whether the catalyst theory is still viable under that doctrine.

The Court, therefore, cannot apply a percentage-of-results method or lodestar-plus-multiplier method based on the common fund doctrine or the common benefit doctrine. Similarly, the Court cannot award Plaintiffs' counsel attorneys' fees and expenses based on the work they did

with respect to persons who did not sign the Retention Proposal but were not part of the settlement. The Court can only compensate Plaintiffs' counsel for the work they did with respect to the Plaintiffs and class members who were part of the settlement.

## C. Plaintiff and Class Member Fees

Plaintiffs' counsel argue that they are entitled to attorneys' fees and expenses with respect to the Plaintiffs' and class members' claims under Section 9.1 of the CIC Plan. In the alternative, Plaintiffs' counsel argues that they are entitled to fees and expenses with respect to those claims under Section 1132(g)(1) of the ERISA statute. Aside from their argument to deny Plaintiffs' counsel's request in its entirety, Defendants agree that Plaintiffs counsel are entitled to fees for the Plaintiffs's and class members' claims, but contend that those fees and expenses should be substantially reduced.

Plaintiffs' counsel state that the total amount of attorneys' fees in this case amounted to $4,270,046.40, and that the total amount of expenses came to $688,121.43. Those amounts are as of August 14, 2002. Due, however, to the practical limitations of submitting briefs to the Court and Plaintiffs' counsel's bill to an expert for auditing, Defendants' arguments truly reflect only upon Plaintiffs' counsel's fees and expenses through June 30, 2002. The Court will therefore deal with Plaintiffs' counsel's fees and expenses from July 1, 2002 to August 14, 2002 separately.

### 1. Section 9.1 of the CIC Plan vs. Section 1132(g)(1) of ERISA

■ The Court finds that Section 9.1 of the CIC Plan should govern Plaintiffs'

counsel's request for attorneys' fees and expenses for the work they have done for the Plaintiffs and class members. This is because Section 9.1 of the CIC Plan states that the Defendants "shall pay all legal fees, costs of litigation, and other expenses" and under ERISA, attorneys' fees and expenses are discretionary. *See Bowles v. Quantum Chemical Co.*, 266 F.3d 622, 636 (7th Cir.2002).[5] And while Section 9.1 does not expressly limit, to reasonableness, the attorneys' fees and expenses claimed, the Court nonetheless reads a reasonableness requirement into the provision. *See Coop. Fin. Ass'n, Inc. v. Garst*, 927 F.Supp. 1179, 1187 (N.D.Iowa 1996). The Court will not, however, as Plaintiffs' counsel requests, interpret the imputed reasonableness requirement in the CIC Plan to allow attorneys' fees for anything other than work done for the Plaintiffs and class members that were the subject of the settlement. As mentioned above, such fees would be inappropriate. The Court will simply take the Defendants' objections to Plaintiffs' counsel's fees and expenses one by one, and will determine whether Plaintiffs' counsel acted reasonably.

### 2. Fees Regarding Certain Motions, Claims, and Conduct

Defendants make the following objections to attorneys' fees based on certain motions, claims, and conduct:

### a. Resisting Defendants' motion to show why attorney Frank Harty should not be held in contempt

■ Defendants argue that Plaintiffs' counsel should not be able to recover attorneys' fees for their resistance of Defendants' motion to hold attorney Frank

---

**5.** Moreover, under the Eighth Circuit's recent decision in *Martin v. Arkansas Blue Cross and Blue Shield*, 299 F.3d 966 (8th Cir.2002), an award of attorneys' fees under ERISA is no longer even a presumption.

Harty in contempt for using, during the deposition of Charles O. Holliday, chairman of DuPont, a poster-sized blow-up of a memorandum that Magistrate Judge Shields had specifically held to be privileged. In their affidavits, Plaintiffs' attorneys Frank Harty and Michael Thrall argue that the memorandum Harty used, known as the "Schickler Memorandum," was not the same Schickler Memorandum as Judge Shields ruled on and that, rather, this was simply a sharp litigation tactic by Defendants. The Court is at a distinct disadvantage as to this issue, because Judge Shields is actually the one who heard this motion and he has not yet issued a ruling on it. From what this Court has been able to put together, however, it cannot say that Defendants' motion was merely a sharp litigation tactic. Plaintiffs should not have used a document that the Magistrate Judge had determined was privileged. Defendants' expert, Bruce Meckler,[6] places the value of this work at $17,828.00.[7] That amount will be deducted as unreasonable or unnecessary as it relates to Plaintiffs claims.

### b. Opposing the Retention Proposal

■ Defendants argue that Plaintiffs' counsel should not recover attorneys' fees for their efforts in opposing Defendants' effort to offer the Retention Proposal. They argue that Plaintiffs' unsuccessful efforts to defeat the Retention Proposal provided no benefit to their clients, and posed a substantial threat to the hundreds of Pioneer executives who were never their clients, and who wanted and ultimately accepted the Retention Proposal. They also argue that Defendants' effort in this regard had nothing to do with contesting the "validity, enforceability, or interpretation" of the CIC Plan. Plaintiffs' counsel counter by arguing that they did in fact enjoy a constructive attorney-client relationship with the putative class members and that they resisted the manner in which the Retention Proposal was offered to avoid any misinformation about the interpretation of the CIC Plan. The Court, in fact, saw fit to place procedural protections on the communications between Defendants and the putative class members. And while the Retention Proposal signers cannot be said to have incurred these fees, as discussed above, the participants who did not sign the Retention Proposal and eventually became members of the settling class benefitted from Plaintiffs' counsel's effort in this regard as well. Thus, the Court will not deduct the value of this work.

### c. Plaintiffs' motion to reconsider

■ On November 5, 2001, the Court granted Defendants' motion for partial summary judgment, holding that the terms of the trigger provision of the CIC Plan were unambiguous and that the Plaintiffs could not introduce extrinsic evidence to vary the meaning of those terms. Plaintiffs later, close to trial, filed a motion to reconsider that ruling, making another argument regarding when the change in con-

---

6. The Court finds Defendants' expert, Bruce Meckler, exceptionally well qualified, and found his report very helpful. The Court also finds Mr. Meckler's testimony to be very credible in this matter, and will refer to his report, as well as to Plaintiffs' experts, when appropriate.

7. Meckler notes that his figures regarding Defendants' objections to certain motions, claims, and conduct include a reduction in the hourly rates for Plaintiffs' Denver counsel. *See infra.* To the extent the Court determines that the work efforts on the motions, claims, and conduct Defendants identify as objectionable are recoverable, Meckler notes that many of the entries would still be objectionable, and would likely cause an increase in the amounts associated with objections to fees for work that Defendants argue was unnecessary, duplicative, or otherwise wasteful.

trol occurred and offering more extrinsic evidence. The Court refused to entertain that motion. Defendants now contend that the Court should not allow attorneys' fees for the prosecution of that motion. The Court agrees. To now allow for attorney's fees after previously rejecting Plaintiffs' motion would be convincingly inconsistent with the Court's prior ruling—not simply because of the rejection, but because it was a motion to reconsider. Defendants should not be charged for a second bite at the apple. Defendants' expert values the work at $38,279.90. That amount will be deducted.

#### d. Attempts to obtain and rely on extrinsic evidence about the definition of Stated Good Reason

Defendants argue that Plaintiffs' counsel seek hundreds of thousands of dollars in attorneys' fees in connection with requesting and reviewing documents, deposing witnesses, and arguing with respect to the meaning of the term "Stated Good Reason," as used in the CIC Plan. Defendants argue that Plaintiffs' counsel should not be compensated for this. Plaintiffs argue that while the Court ultimately ruled against them on a portion of their argument they were nonetheless reasonable in pursuing it. They further argue that the evidence would have been relevant to, as was intimated by the Court, what standard the Severance Committee must apply in reviewing the reasonableness and good faith of a plan participant's determination and whether the Severance Committee members breached their fiduciary duties with respect to that interpretation. The Court does not agree completely with either argument. Certainly, if the evidence was relevant it was not relevant to the tune of hundreds of thousands of dollars. The problem, however, is that the Court has no hard figure from which to discount the value of this work. Therefore, because Plaintiffs took no issue with Defendants'

characterization of hundreds of thousands of dollars—and because that sounds like the right ballpark from the Court's knowledge of this case—the Court will deduct $100,000.00.

#### e. Defending the counterclaim against Plaintiff Jeanne Foster

Defendants argue that Plaintiffs' counsel should not be awarded attorneys' fees for their work in defending the counterclaim against Plaintiff Jeanne Foster. Defendants counterclaim against Foster consisted of an allegation that she purloined documents from her client/employer, Pioneer, and revealed them to others. Plaintiffs argue that the counterclaim was completely unsupportable, and was merely a tactic used by Defendants. In support of their argument, they cite the fact that Foster's supervisors were not consulted before the counterclaim was asserted. Nonetheless, the Court cannot conduct a complete adjudication on the claim to determine its merits. Rather, the Court is left to simply deduct the value because it was not based on the same topic as Foster's claims. Defendants' expert places a value of $19,394.50 on this work. That amount will be deducted.

#### f. Work done on a second contemplated lawsuit that was never commenced

Apparently, Plaintiffs' counsel did some work regarding an as-of-yet uncommenced securities lawsuit against Defendants. Plaintiffs agree. Although there seems to be some confusion on exactly how much should be deducted, the Court will take Defendants' expert's figure of $28,878.50.

#### g. Motion for interim attorneys' fees

Defendants argue that Plaintiffs' counsel should not be awarded attorneys' fees for the motion for interim attorneys' fees they

brought earlier in this suit regarding the Retention Proposal signers. Plaintiffs argue that the Court only rejected the motion so that it could address it at a more appropriate time. The Court agrees with both parties, and now that the Court has determined that Plaintiffs' counsel are not entitled to fees with respect to the Retention Proposal signers, it will not award fees generated in bringing that motion. Defendant's expert valued that work at $80,594.00. That amount will be deducted.

### h. ERISA challenge

██ Defendants argue that Plaintiffs' counsel are not entitled to recover attorneys' fees for their unsuccessful attempts to commence this ERISA action in state court, assert preempted state law causes of action, or remand the action after removal. They essentially argue that Plaintiffs' counsel should have known that ERISA governed this action and, in addition, that fees are not recoverable for this work under Section 9.1 because they were not incurred as a result of Pioneer contesting the validity, enforceability, or interpretation of the CIC Plan. The determination of whether the CIC Plan is governed by ERISA clearly involves the interpretation of the plan. How clear that determination was is a different question. The only argument that gives the Court pause here is Plaintiffs' attorney Michael Thrall's ERISA expertise. Thrall is clearly knowledgeable in ERISA law. But Plaintiffs' position on the CIC Plan not being governed by ERISA rested largely on their theory that the subjective trigger for Stated Good Reason was a totally subjective trigger, and also on a theory that the objective trigger was simple enough not to necessitate review. Hindsight has certainly shown that theory to be ill-conceived. Regardless of hindsight's clarifying effect, however, the Court must conclude that such a theory was unreasonable. Defen-

dants' expert values that work at $48,437.40. That amount will be deducted.

### i. Plaintiffs' counsel's trip to Minneapolis on April 8, 2002

██ Defendants flippantly refer to this as a shopping trip. In actuality, it was a trip by attorneys Michael Thrall and Gerald Newbrough to discuss the settlement agreement. Plaintiffs' counsel state that, in fact, other than buying lunch they bought nothing during the trip. Plaintiffs' counsel explain that they went to Minneapolis, where Defendants' counsel is located, to personally discuss the confidentiality of the class action settlement agreement. Plaintiffs' counsel state that it was an extremely important issue, and that when Defendants remained insistent on keeping the settlement confidential, Plaintiffs' counsel left the meeting thinking the settlement had fallen apart. While this negotiating style pushes the envelope of reasonableness, because Plaintiffs' counsel viewed the issue as vital to the settlement and thus thought remaining issues were superfluous at that point, the Court will not deduct the value of this work.

### 3. Fees Regarding Work that was Unnecessary, Duplicative, or Otherwise Wasteful

Defendants make the following objections regarding work that they contend was unnecessary, duplicative, or otherwise wasteful:

### a. Excessive billing rates

Defendants argue that Plaintiffs' Denver, Colorado counsel should not be compensated at the rates they submitted. Rather, Defendants argue that they should be compensated at the prevailing rates of Des Moines, Iowa attorneys with similar qualifications and experience. Their primary argument in this regard is that the

Court certified both Des Moines and Denver counsel as counsel for the class. Accordingly, Defendants argue, all of Plaintiffs' counsel are only entitled to Des Moines rates, because the Court deemed Des Moines attorneys competent to handle the case.

Plaintiffs' counsel contend that it was necessary to hire out of town counsel and, therefore, that Plaintiffs' Denver counsel should be compensated at Denver rates. They argue that while Plaintiffs' Des Moines counsel had the requisite ERISA experience, they needed to go to Denver to find the necessary class action experience. In support of this argument, they submit proponent affidavits from other Des Moines attorneys. The Court agrees with Plaintiffs' counsel, but not only because of the apparent dearth of class action experience in Des Moines. Rather, the Court bases its finding in large part on the skill and experience of Defendants' attorneys in this case. Defendants were represented by counsel at the Minneapolis office of Faegre & Benson LLP. Defendants' counsel have proven themselves formidable in these cases and have vigorously defended their client's interests. To that end, the Court believes that it was reasonable for Plaintiffs to hire the Denver firm of Hoffman, Reilly, Pozner & Williamson LLP to counter Defendants' forces.

Lastly, the Court's reasonableness finding is based on Plaintiffs' expert's concession that Hoffman, Pozner, and Reilly's rates should be reduced from $450, $400, and $360 to $375, $350, and $325, accordingly. Plaintiff's expert, Bennet Aisenberg, assures the Court that these rates are reasonable in Denver. The Court will therefore deduct the value of Plaintiffs' counsel's work by $48,550, the figure Plaintiff's expert came up with in his calculations.[8]

### b. Overstaffing

Defendants argue that the Court should reduce Plaintiffs' counsel's fees based on their overstaffing of this case. As an example, they cite the fact that two to six attorneys from Plaintiffs' two firms routinely attended depositions, and all six of Plaintiffs' attorneys attended nearly every deposition and hearing. Defendants calculate that Plaintiffs averaged 3.77 at hearings and 2.00 attorneys at depositions. The Court—and Plaintiffs' own expert, to an extent—agrees with Defendants. The amount to which Plaintiffs' counsel's bill should be reduced, however, appears to be encompassed in other calculations by Defendants' expert; in any event, the Court will treat it as being so. Thus, the amount deducted under this objection will be reflected in other objections below.

8. The trial court itself is viewed as being an expert on attorneys' fees and is thus given a certain amount of deference. *See Gilbert v. City of Little Rock Arkansas*, 867 F.2d 1063, 1066 (8th Cir.1989). While this Court sets the Plaintiffs' Denver counsel's hourly rates at $375, $350, and $325 and accepts the hourly rates stipulated to by Defendants for Plaintiffs' Des Moines counsel of $210, $230, and $245, it nevertheless expresses remorse in doing so. That is because knowing these kind of hourly rates are agreed to by the parties as being "reasonable" makes them beyond the reach of the vast majority of people in the United States. The fact that we have such an inaccessible legal system should be the concern of every person who cares about our legal system including judges and lawyers. The Court, however, is not unmindful of the fact that while a lawyer's hourly rate often captures public and media attention it should not be overlooked that "like other lawyers, class counsel are entitled to earn enough money to support themselves, their families, their law offices, and their staff over long periods of time while expenses accrue and no income is forthcoming." *See Muehler v. Land O'Lakes*, 617 F.Supp. 1370, 1377 (D.Minn. 1985).

#### c. Work by overqualified personnel

Defendants argue that Plaintiffs' counsel staffed all the public proceedings in these cases at the top end of their personnel, resulting in unreasonable charges for work that could have been done at a much lower level. They state that, to their knowledge, no associate ever appeared at any deposition, hearing, settlement conference, or other proceeding in this litigation. Defendants contend that it is patently unreasonably to say that every public proceeding in this litigation required the expertise and experience of a senior lawyer. Again, Plaintiff's expert agrees that this case was probably overstaffed in terms of seniority. In their defense, Plaintiff's counsel notes that they did use a contract attorney to be the lead person on the document database. The Court finds that some amount should be deducted based on this objection. Defendants' expert's calculation as to the value of this work, however, appears to be split among objections. The figures involved in this objection encompass the previous objection and the next objection below. Accordingly, the Court will address the amounts that should be deducted for this objection and the previous objection in the context of the objection below.

#### d. Duplicative work

Defendants argue that, in addition to the previous two objections, Plaintiffs' counsel's submissions reveal a number of instances where the attorneys seek fees arising from duplicative work in legal research, drafting, discovery, and investigation. The Court finds merit in this objection as well as Defendants' previous two objections. It does not agree, however, to the extent represented by the Defendants' expert's figures. For example, the Court notes that Plaintiffs' counsel plainly appear to be guilty of using senior personnel to too great an extent. At the hearing, however, Defendants' expert admitted that he could not identify which one of the almost fifty depositions take by Plaintiffs could have been done by an associate. In addition, in his affidavit, Plaintiffs' attorney Larry Pozner explains the substantial efforts that were made to coordinate work and avoid duplicative efforts. Defendants' expert calculates that $347,630 should be deducted for fees resulting from billing for clerical/administrative and other non-legal tasks and that $743,709 should be deducted for fees resulting from inefficient and duplicative efforts, for a total of $1,091,339. Plaintiffs' counsel's expert states that $200,000 should be deducted for "excessive duplication or inefficient staffing, etc." The Court will split the difference between the two experts and deduct $645,669.50.

#### e. Excessive time

Defendants argue that, beyond the objections noted above, Plaintiffs' counsel's claim is excessive given the tasks involved. In particular, they cite the pretrial work Plaintiffs' counsel conducted after the settlement, the amount of time attorney Gerald Newbrough spent summarizing depositions, the amount of time Plaintiffs' counsel spent drafting initial discovery requests, and the amount of time spent on the research in regard to the infamous Schickler Memorandum. In addition, Defendants' expert's opinion, which overlaps with Defendants' brief in this regard, adds objections to the amount of time spent on Plaintiffs' fee application and document review. The Court agrees with these objections in part. Defendants' expert places a figure of $70,621 on the work he identifies. The Court will therefore deduct $50,000.

#### f. Expenses

Defendants stipulated to the adequacy of the documentation of Plaintiffs' counsel's expenses. Defendants, however, still object to the travel time and related ex-

penses for out-of-town attorneys, overhead expenses, and vague expenses. The Court finds Defendants' objection as to travel time and related expenses for out-of-town attorneys to be subsumed in the Court's denial of Defendants' earlier objection as to the appropriateness of out-of-town counsel. The Court, however, agrees with Defendants' expert as to the overhead and vague expenses. Defendants' expert places a figure of $26,744 on those expenses. The Court will deduct that amount.

### g. Inadequate documentation of attorneys' fees

Defendants object to the inadequate documentation of Plaintiffs' counsel's fees. They complain, for example, that a fair portion of the attorneys' time is entered in "block" entries.[9] They also complain that a substantial number of Plaintiffs' counsel's time entries are also vague and lack the detail necessary to allow the Court to determine what work was actually performed. Defendants argue that the Court should therefore reduce Plaintiffs' counsel's fees by a percentage to account for such billing practices. While the Court agrees with Defendants in their objections, it will not reduce Plaintiffs' counsel's bill any further based on this objection because it finds that Defendants' expert has already taken some of these vague billing practices into account in arriving at his other figures.[10]

### h. Lack of mitigation

Defendants argue that Plaintiffs' counsel failed to mitigate their excessive fee request, and, in doing so, should be penalized by having their fees further reduced. The Court disagrees. While finding many reasons to reduce their bill, the Court credits Plaintiffs' counsel for not attempting to make their fees a part of the settlement, and will not further reduce their award on the basis of lack of mitigation.

### i. Proportionality

Finally, Defendants argue that Plaintiffs' counsel's fees should be reduced because they are not in proper proportion to what they achieved in these cases. Defendants cite as the amount achieved $1,256,458.00, the amount of Foster's and Pennington's settlements. The Court disagrees with the amount achieved. The Court finds that Plaintiffs' counsel achieved an amount of $7,524,943.40—the difference between the two figures being the amount of the unnamed class members' settlements. In any event, the Court will reserve ruling on this objection until the end of the analysis so that the determination will accurately reflect the amount of Plaintiffs' counsel's total bill.

### 4. Foster's and Pennington's Assignments of Fee Claims

As yet another way of reducing Plaintiffs' counsel's fees, Defendants argue that because Pennington and Foster assigned their rights to attorneys' fees under Section 9.1 of the CIC Plan to their attorneys, they cannot now assert their rights through this motion. The Court sees no problem with Plaintiffs' motion. While Plaintiffs are nominally bringing the application for attorneys' fees, the actual attorneys' fees will be awarded to the Plaintiffs' attorneys.

---

9. Defendants explain block entries as situations where all the time for each time-recorder for each day is presented in a single block with a total amount of time for the day, regardless of the number of tasks the recorder performed, and with no indication of how much time each individual task took.

10. See Rule 26(a) Report of Bruce R. Meckler, Esq. Concerning Plaintiffs' Application for Attorneys' Fees and Expenses at 13.

### 5. Attorneys' Fees from July 1, 2002 to August 14, 2002

As a final matter, the Court must determine what Plaintiffs' counsel are entitled to for the period extending from July 1, 2002 to August 14, 2002. The Court noted at the beginning of this analysis that due to the practical restraints of this being an ongoing process, Defendants and Defendants' expert really only had a chance to object to Plaintiffs' counsel's bill as through the end of June 2002. The Court will calculate this by figuring out what percentage it deducted from Plaintiffs' counsel's June 30 bill based on Defendants' objections regarding work that was unnecessary, duplicative, or otherwise wasteful, and will apply that percentage to the remaining portion of the bill.[11] At this point the Court will calculate the total bill and compare it to the value created by Plaintiffs' counsel to determine whether it is proportionate. The Court will conduct the same analysis for expenses.

#### SUBTOTALS

**Attorneys' Fees**

| | |
|---|---|
| Fees Requested through 8/14/02 | $4,270,046.40 |
| Plus—Amounts redacted from Harty affidavit [12] | $ 4,930.50 |
| Minus—Amounts from Defs' Objections re: motions, claims, and conduct | $ 333,412.30 |
| Minus—Amounts from Defs' Objections re: work | $ 744,219.50 |
| Minus—Objections based on work from 7/1/02 to 8/14/02 [13] | $ 40,830.60 |
| **Total** | **$3,156,514.50** |

**Expenses**

| | |
|---|---|
| Expenses Requested through 8/14/02 | $ 688,121.43 |
| Minus—Objections | $ 26,744.00 |
| Minus—Objections from 7/1/02 through 8/14/02 | $ 2,845.14 |
| **Total [14]** | **$ 658,532.29** |

This leaves Plaintiff's counsel with a subtotal on attorneys' fees of $3,156,514.50. The value the Court finds Plaintiffs' counsel created in compensable gains is $7,524,943.40. That means that Plaintiffs' counsel would stand to receive fees in proportion the recovery in the amount of 42%. To account for the fact that Defendants' expert's calculations under-credited Plaintiffs' hourly rates (because the Court found Plaintiffs' Denver counsel were entitled to Denver rates), and Defendants' expert's overlapped some, the Court will reconfigure Plaintiffs' counsel's fees to 40%. That reduces Plaintiffs' counsel's fees to $3,009,977.30. This amount the Court finds to be in an appropriate proportion to the recovery. The Court sees no problem with the expenses in the amount of $658,532.29.

### D. Prejudgment Interest

■ Lastly, Defendants note that in their application Plaintiffs' counsel stated that prejudgment interest must be awarded. Defendants note that the Tenth Circuit has stated that "[u]ntil attorneys' fees are 'meaningfully ascertained' by being quantified in a final, appealable judgment, interest should not accrue." *Wheeler v.*

11. The Court believes that this to be the most equitable manner in which to deal with the inherent practical restraints imposed.

12. The Court adds the figures in Frank Harty's affidavit dealing with the alleged double entries and work done on a second lawsuit, because those amounts were counted in other objections and Plaintiffs' counsel subtracted those figures from its August 14 bill.

13. In determining this amount, the Court takes into account the alleged double entries and work done in a second lawsuit identified in Frank Harty's affidavit.

14. The Court does not include as part of the amount deducted from the objections the amounts itemized and redacted in Frank Harty's affidavit. The Court does, however, take those into account in figuring the percentage applied to the July 1 to August 14 amount.

*John Deere Co.*, 986 F.2d 413, 416 (10th Cir.1993) (quoting *MidAm. Fed. Sav. & Loan Ass'n v. Shearson/Am. Express, Inc.*, 962 F.2d 1470, 1476–77 (10th Cir.1992)). Plaintiffs make no mention of prejudgment interest in their briefs. Therefore, the Court will not award any prejudgment interest on the amounts granted in this matter.

### III. CONCLUSION

Plaintiffs' Combined Application for Award of Attorneys' Fees and Expenses (Clerk's No. 459) is GRANTED IN PART and DENIED IN PART. Defendants are hereby ordered to pay Plaintiffs' counsel $3,009,977.30 in attorneys' fees and $658,532.29 in expenses, for a total of $3,668,509.50.

IT IS SO ORDERED.