Michelle ANTOLIK, Sara Biris, Marleen Dixon, Anne Golke, Carol Jones, Jennifer Ladehoff, Susan McClellan, Darlene Owens, Linh Phantahavong, Susan Robeoltman, Dena Steinbach, Julie Vogeler, Connie Ward, Tosha Whitson, Cheryl Womack, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

SAKS INCORPORATED, d/b/a Younkers, Defendant.

No. 4:03 CV 90203.

United States District Court, S.D. Iowa, Central Division.

Jan. 3, 2006.

Justin E. LaVan, LaMarca & Landry, George A. Lamarca, Lamarca & Landry PC, Des Moines, IA, for Michelle Antolik, Sara Biris, Marleen Dixon, Anne Golke, Carol Jones, Jennifer Ladehoff, Susan McClellan, Darlene Owens, Linh Phantha-vong, Susan Robeoltman, Plaintiffs.

Amy M. Bjork, Angela Ellen Dralle, Dennis Wayne Johnson, Dorsey & Whit-ney LLP, Des Moines, IA, for Saks Incor-porated, Defendant.

## ORDER

PRATT, District Judge.

Before the Court is a motion, filed by Plaintiffs, entitled "Plaintiff's Motion for Attorney Fees and Expenses" (Clerk's No. 94). Plaintiffs previously filed a Bill of Costs (Clerk's no. 93), requesting that the Court award certain expenses. Because the amount requested in the Bill of Costs is included within Plaintiffs' requested ex-penses in the Motion for Attorney Fees and Expenses, the Court will consider both pleadings together. Defendant filed a re-sistance to Plaintiffs' Bill of Costs, and with permission of the Court, filed adver-sary submissions regarding Plaintiffs' re-quested attorneys' fees. *See* Clerk's Nos. 97, 103. The matters are fully submitted.

### I. BACKGROUND

On March 16, 2003, Plaintiffs filed a Petition in the Iowa District Court in and for Polk County, Iowa, against Defendant Saks Inc. ("Saks"), alleging breach of con-tract, promissory estoppel, violation of Iowa Code chapter 91A (Wage Payment Collection Law), and fraudulent misrepre-sentation. Defendant removed the matter to this Court on April 14, 2003, on the basis of both federal subject matter juris-diction and diversity of citizenship. On August 13, 2003, the Court issued an Or-der on Defendant's Motion to Dismiss Plaintiffs' claims. *See* Clerk's No. 19. The Court found that the Employee Re-tirement Income Security Act ("ERISA") preempted Plaintiffs' state law claims and dismissed those claims as a result. Plain-tiffs were, however, provided an opportuni-ty to file an Amended Complaint alleging a cause of action under ERISA. Plaintiffs' filed such an Amended Complaint on Au-gust 19, 2003 (Clerk's No. 20), but again

reiterated the state law claims previously dismissed, with an added "In the Alternative" section raising a claim under ERISA and a claim for breach of fiduciary duty. Upon Defendant's Motion, the court struck the state law claims from the Amended Complaint, leaving only the ERISA and breach of fiduciary duty claims.

On June 14, 2005, Defendant filed a Motion for Summary Judgment as to both of Plaintiffs' claims. On July 15, 2005, Plaintiffs filed a cross Motion for Summary Judgment. On August 17, 2005, this Court issued an Order (Clerk's No. 68) denying Plaintiffs' Motion for Summary Judgment in its entirety, and denying Defendant's Motion for Summary Judgment on Plaintiffs' ERISA claim. The Court granted Defendant's Motion for Summary Judgment as to Plaintiffs' claim of breach of fiduciary duty. The ERISA claim was heard by bench trial on August 30 and 31, 2005. Having previously found that an October 27, 2000 letter which Defendant distributed to introduce and explain the 2000 Change of Control and Material Transactions Severance Plan ("Change of Control Plan"), was a faulty Summary Plan Description ("SPD"), the Court went on to consider, at trial, whether the terms of the undisclosed formal plan document and the faulty SPD were in conflict, and whether the Class Plaintiffs relied upon or were prejudiced by the faulty SPD. In its September 23, 2005, Findings of Fact, Conclusions of Law, and Order on Bench Trial (Clerk's No. 90, "Order"), the Court determined that there was a conflict between the formal plan document and the faulty SPD regarding the definition of "change of control." Order at 21. Accordingly, the Court concluded that the words of the SPD control the terms of the ERISA plan. *Id.* Moreover, the Court determined that the Class Plaintiffs were prejudiced by the misinformation found in the faulty SPD, and were, therefore, enti-

tled to damages. *Id.* The Court ordered damages for Class Plaintiffs in the amount of $1,661,317.62, plus prejudgment interest. *Id.* at 24. The Court withheld judgment on the issue of costs and attorneys' fees pending additional briefing by the parties. *Id.* The additional briefing is complete and the Court now turns to the merits of Plaintiffs' Motion for Attorney Fees and Expenses.

## II. ATTORNEYS' FEES AND EXPENSES

### A. *Attorneys' Fees*

ERISA authorizes a court "in its discretion" to allow "a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). Although an award of attorneys' fees is not mandatory, *see Lawrence v. Westerhaus*, 749 F.2d 494, 495 (8th Cir.1984), there has historically been a presumption that a prevailing plan beneficiary should recover reasonable attorneys' fees unless "special circumstances" would make such an award inequitable. *See Lutheran Med. Ctr. v. Contractors, Laborers, Teamsters and Eng'r Health and Welfare Plan*, 25 F.3d 616, 623 (8th Cir.1994). In 2002, the Eighth Circuit Court of Appeals held that no such presumption in favor of awarding attorneys' fees exists in ERISA actions. Noting that the language of ERISA has "neutral, discretionary attorney fee language, and equally neutral (or sparse) legislative history concerning attorney fees," the appellate court emphasized that the determination of whether to award attorneys' fees in ERISA actions is within the sound discretion of the district court, to be applied after considering "several non-exclusive factors." *Martin v. Arkansas Blue Cross and Blue Shield*, 299 F.3d 966, 971 (8th Cir.2002). Thus, in deciding whether to award attorneys' fees, a court should con-

sider the five factors articulated in *Wester-haus*: (1) the opposing party's degree of culpability or bad faith; (2) its ability to pay; (3) the potential deterrent effect of a fee award; (4) whether the moving party sought to benefit all plan participants or beneficiaries or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions. These factors "are by no means exclusive or to be mechanically applied ... as a mechanical application of the factors may serve to undermine 'both the substantive purpose of ERISA and the discretion vested in the courts to carry out that purpose.'" *Martin*, 299 F.3d at 972 (quoting *Eddy v. Colonial Life Ins. Co. of Am.*, 59 F.3d 201, 207 (D.C.Cir.1995)). "Instead, the district courts should use the factors and other relevant considerations as general guidelines for determining when a fee is appropriate." *Martin*, 299 F.3d at 972; *see also Beatty v. N. Cent. Cos.*, 282 F.3d 602, 605 (8th Cir.2002) (recognizing that a district court "is not required to consider all of the factors in every case.").

1. *Degree of culpability.*

■ Plaintiffs argue that Defendant was extremely culpable in denying benefits under the October 27, 2000 Letter to its employees when it underwent an internal consolidation:

Saks put together a scheme to deliberately take advantage of the Class Plaintiffs. Its carefully crafted faulty SPD, together with the concealed definition of "change of control" in the formal plan document, reveals a high degree of culpability. This is a fair conclusion given that Saks knew of and preyed upon the Class Plaintiffs' insecurities after the Herberger's consolidation.

Clerk's No. 94, Pls.' Br. at 4. Defendant, on the other hand, insists that there is no evidence in the record indicating that it acted culpably or in bad faith:

Several members of Saks' management team who were involved in drafting and distributing the letter were under the impression that the October 27, 2000 letter was an accurate summary of the Change of Control Plan and clearly communicated the terms of the Change of Control Plan .... There was no intention on the part of Saks to mislead employees in distributing the letter. Saks had nothing but good intentions in adopting the Change of Control for the benefit and welfare of its employees.

Clerk's No. 96, Def.'s Br. at 2.

There is no doubt that the single greatest controversy in this case regarded the definition of "Change of Control." The term was used three times in the October 27, 2000 Letter, as discussed in the Court's Findings of Fact and Conclusions of Law. No separate definition of Change of Control was found in the letter, meaning that it must, in the context of ERISA law, be given its plain and ordinary meaning. While Defendant vehemently argued that the phrase was ambiguous, the Court found, as a matter of law, that it was not. Thus, when Younkers, a major business unit, came under the control of Carson Pirie Scott, a change of control within the meaning of the October 27 Letter occurred. Because the term change of control conflicted with another ERISA plan document, Plaintiffs were required to, and did, show detrimental reliance on the letter in order to succeed on their claim that Defendant violated ERISA by failing to grant them the benefits described in the Letter.

In the context of this case, the evidence showed that a period of unrest at Younkers existed prior to distribution of the October 27 Letter. There had been two major internal consolidations, and employ-

ees were leaving and concerned that Younkers would be consolidated with another division of Saks. The purpose of the October 27 Letter, as revealed by trial testimony, was to "allow people to return their focus to doing their job and doing the best work they are capable of doing." Trial Tr. vol. 2 at 303. More specifically, the Letter was intended to get workers to "return to productivity," *id.* at 304, and that is precisely what it did. The distribution of the October 27 Letter set employees' minds at ease and provided them with a "concrete assurance that they would be given a cushion of time in which to find other employment" should Younkers be sold or consolidated. Order at 18.

While clearly this is not the type of blatant bad faith conduct by Saks as was found in *Sheehan v. Guardian Life Ins. Co.,* 372 F.3d 962, 968 (8th Cir.2004), where an employer refused a plaintiff's requests for information and refused to cooperate with her during the administration process, Saks is not without some degree of culpability in the matter. Saks was well aware that employees at Younkers were fearful for their jobs, in large part because of two prior internal consolidations within the Saks divisional units. Saks distributed the October 27, 2000 Letter to quell these fears and return workers to a feeling of being secure with respect to their employment. While Saks can reasonably claim that it believed the Letter did not provide benefits in the event of an internal consolidation, it cannot reasonably claim that it was without any notion that employees believed the Letter in fact provided such benefits. Indeed, it was Saks itself who drafted the Letter without any definition of Change of Control, or any reference to any other ERISA plan document. Moreover, management met with employees, read the Letter verbatim, and reaped the benefit when employees felt more secure in their positions with Younk-

ers. The record clearly reveals that employees at Younkers were concerned primarily with an internal consolidation and that Saks knew it. Accordingly, while this factor does not heavily weigh in favor of Plaintiffs, the scales are tipped, at least to some extent, in that direction.

### 2. *Ability to pay an award.*

Saks concedes that it is a large company and has the capability to pay an award of attorneys' fees should it be ordered to do so. Nonetheless, Saks correctly points out that its "ability to pay the attorney fees is not sufficient to support an award of attorney fees [if] the other factors weigh against an attorney fees award." *Hebert v. SBC Pension Benefit Plan,* 354 F.3d 796, 801 (8th Cir.2004); *Cont'l Assur. Co. v. Cedar Rapids Pediatric Clinic,* 957 F.2d 588, 595 (8th Cir.1992).

### 3. *Deterrent effect.*

Plaintiffs argue that an award of attorneys' fees in this case will have a future deterrent effect under similar circumstances. According to Plaintiffs, corporations such as Saks will have no deterrent to improperly deny ERISA benefits to its employees if the only risk of a plaintiffs' court victory is having to pay the improperly denied benefits. Defendant, on the other hand, argues that it successfully defeated Plaintiffs' claim of breach of fiduciary duty at the Summary Judgment stage, and had substantial defense for its denial of benefits under Eighth Circuit law. Moreover, Defendant argues that the present situation was a unique one, unlikely to reoccur, and thus not likely to be deterred by an award of attorneys' fees.

While again, the matter is a close one, the Court finds the balance weighs somewhat more with Plaintiffs than with Defendant. Defendant crafted a benefits Letter,

upon which its employees justifiably relied. It did so, as discussed *supra*, with knowledge that employees were concerned about the effects of an internal consolidation. Nonetheless, Defendant made no real attempt to inform the employees that it did not believe "Change of Control" would apply to an internal consolidation. Rather, Defendant expected Plaintiffs to have some specialized knowledge of the definition of a term that was not defined for them. While the Court does not doubt Defendant's belief in its position, it does appear clear that an award of attorneys' fees in this matter will deter Defendant, and other like employers, from carelessly drafting documents meant to be clearly understood by everyday persons, such as the Younkers employees.[1] The Court, however, takes issue with Plaintiffs' brief where it is claimed: "In the broader context of this litigation, an award of fees and expenses below what Class Plaintiffs seek will constitute a victory for large corporations and encourage the very ERISA violations and avoidance of severance payments that the ERISA is designed to prevent." Pls.' Br. at 8. While the Court acknowledges the Eighth Circuit's reference in *Martin* to "several non-exclusive factors" in determining an attorney fee and the amount of the fee, it is clear that any consideration of "punishing" a defending plan sponsor or company of any size would be inappropriate and not faithful to the law of the Eighth Circuit. The Court rejects Plaintiffs' argument that any award other than what they seek is necessarily a "victo-

ry for large corporations" and will "encourage ERISA violations."

4. *Whether the parties sought to benefit all participants and beneficiaries or to resolve a significant legal question regarding ERISA itself.*

This factor also weighs in favor of an award of attorneys' fees. Defendant attempts to diminish Plaintiffs' action by pointing out that the term "Change of Control" in the company's formal ERISA benefit plan is clearly defined. Thus, according to Defendant, Plaintiff's action, based only on the October 27, 2000 Letter, will benefit only those who received the letter, specified in the Class definition, and not the numerous other Saks employees covered by the formal "Change of Control" plan. While Plaintiffs' action did not benefit "all" participants or beneficiaries of Saks' ERISA plan, it did benefit a substantial number of employees subject to Defendant's ERISA plan, and specifically intended to benefit all those who received the faulty SPD. Moreover, while the area of law regarding faulty SPDs is well-established in the Eighth Circuit, the issue of what constitutes a faulty SPD versus a wholly insufficient SPD is not so clearly defined. The October 27, 2000 Letter was unique in many ways when compared to SPDs that have previously been classified in one category or the other, and thus, a significant legal question specific to ERISA was sought by Plaintiffs class to be resolved.

---

1. Interestingly, one judge on the Eighth Circuit Court of Appeals, Judge Bye, joined by Judge McMillian in a concurrence-in-part and dissent-in-part in *Martin*, has expressed discontent with the five-factor *Westerhaus* test, and in particular with the first three factors, noting that they are " 'an unhelpful method for determining the appropriateness of awards to prevailing plaintiffs in ERISA ac-

tions.' " *Martin*, 270 F.3d at 677 ("I would abandon the first three factors and replace them with one-'whether a reasonable plaintiff would have brought suit if no award of attorney's fees was possible.' ") (Bye, J., dissenting) (quoting Mark Berlind, *Attorney's Fees under ERISA: When is an Award Appropriate?*, 71 Cornell L.Rev. 1037, 1058, 1062 (1986)).

5. *The relative merits of the parties positions.*

Defendant does not dispute that this Court found Plaintiffs' position on the status and effect of the October 27, 2000 Letter more meritorious than it did the Defendant's position. Nonetheless, Defendant argues that there was not a "gross disparity" between the parties' positions, given that Saks prevailed on its Motion for Summary Judgment on Plaintiffs' claim of breach of fiduciary duty. Saks additionally points out that Plaintiffs' counsel never argued that the letter was a faulty SPD, leaving it instead to the Court to establish the basis for remedy.[2] Admittedly, Saks' legal position in this case was not frivolous. Nonetheless, the fact that Plaintiffs were deemed correct in their position that they were entitled to benefits under the October 27, 2000 Letter tips the scale, at least minimally in Plaintiff's direction.

Based on the five *Westerhaus* factors, and based on the evidence presented at trial, the reasonably large Plaintiff class in this matter, and the overall nature and tenor of the trial testimony, the Court finds that an award of attorneys' fees is appropriate in this matter. The issue remaining, then, is what amount of attorneys' fees are reasonable and appropriate on the facts of this case.

■ "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Plaintiffs request $642,467.64 in attorneys' fees in this matter and propose two different approaches to reach that result. First, Plaintiffs propose a "Fee Shifting Award", which would use the proposed lodestar amount of $292,852.50, enhanced by a multiplier of 2.19. The second method, giving the same dollar result, is what Plaintiffs title as a "Common Fund Award," based on a straight 35% of Plaintiffs' total recovery.

■ There are two primary methods used in determining an appropriate attorneys' fee. The first, commonly known as the "Common Fund" method, applies to cases where a large common fund is created for the benefit of a class of Plaintiffs. Often the fund is created as the result of settlement, though sometimes, it is the result of a verdict and judgment. To determine fees under the "Common Fund" method, courts set a reasonable fee based on a determination of a reasonable percentage to be awarded from the common fund. *See Blum v. Stenson*, 465 U.S. 886, 900, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). The guiding principle behind the doctrine is that lawyers who recover a common fund for the benefit of their clients and others are entitled to reasonable attorneys' fees from the fund. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The doctrine "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense ...." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). This outcome may be avoided by "spreading fees proportionately among those benefitted by the suit," and particularly by avoiding a windfall to those who benefit from the suit's award, but did not undertake any action in its prosecution. *See id.* Despite the presence of a large judgment in the present case, it is not a "common fund" within the meaning generally ascribed to that term. The

---

**2.** This factor is better considered in determining what amount of attorneys' fees are appro- priate, rather than if they should be awarded in the first instance.

Court made careful calculations regarding the amount to be compensated to each plaintiff in the Plaintiff class. There are no additional funds comprising a pool waiting to be distributed to unknown claimants. Moreover, because of the presence of a discretionary fee-shifting statute, the Court may shift some or all of the costs of attorney representation to the Defendant in this case, rather than awarding a specific amount to be deducted from judgment at the cost of individual plaintiffs.

■ The more common approach in cases where a fee-shifting statute is present, is the lodestar method. For an excellent review of the various methods that lawyers have historically employed to bill clients and be paid, see Justice Ginsburg's review in *Gisbrecht v. Barnhart,* 535 U.S. 789, 799, 122 S.Ct. 1817, 152 L.Ed.2d 996 (2002). To calculate the lodestar, the Court multiplies the number of hours reasonably expended by counsel by a reasonable hourly rate. *See Hensley,* 461 U.S. at 433, 103 S.Ct. 1933; *Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir.1973). Historically, the lodestar could be increased, or occasionally decreased, by use of a multiplier based on the contingent nature or risk involved in the case and based on the quality of the attorneys' work. In *City of Burlington v. Dague,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), however, the Supreme Court found that enhancement of the lodestar to account for the contingency risk of a case is impermissible:

> The risk of loss in a particular case (and, therefore, the attorney's contingent risk) is the product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits. The second factor, however, is ordinarily reflected in the lodestar-either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so.

*Dague,* 505 U.S. at 557, 561, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). Thus, while courts may not apply a multiplier to the lodestar to account for contingency risk, that risk may be considered in determining the appropriate hourly rate and in determining what constitutes a reasonable amount of hours expended given the facts of each specific case. *See Kientzy v. McDonnell Douglas Corp.,* 990 F.2d 1051, 1062–63 (8th Cir.1993) (remanding case for consideration of the whether the merits of the case were adequately factored into the lodestar amount). A multiplier is still permissible, however, when an attorney's performance is deemed superior. On the specific facts of this case, the Court believes the lodestar method is the appropriate measure of attorneys' fees.

■ In 1974, the Fifth Circuit Court of Appeals set forth guidelines to be considered in determining an award of attorneys' fees. *See Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974). The *Johnson* decision was described by Justice Ginsburg as being an "influential opinion." *See Gisbrecht,* 535 U.S. at 799, 122 S.Ct. 1817. These guidelines are frequently used by courts in the Eighth Circuit in determining the adequacy of a lodestar calculation. *See Zoll v. Eastern Allamakee Cmty. Sch. Dist.,* 588 F.2d 246, 252 (8th Cir.1978); *Allen v. Amalgamated Transit Union, Local 788,* 554 F.2d 876, 884 (8th Cir.1977). Under *Johnson,* the district court must consider the following twelve factors when assessing attorneys' fees: (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment due to acceptance of the case; (5) the customary

fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Zoll*, 588 F.2d at 252 n. 11. "Under the *Johnson* standards, the minimum award should generally be not less than the number of hours claimed times the attorney's regular hourly rate." *Id.* at 252. "This statement, however, [is] not a complete limitation on the district court's discretion to award only 'reasonable' attorney fees, but only a general guideline to be followed in the absence of unusual circumstances." *Ladies Center, Neb., Inc. v. Thone*, 645 F.2d 645, 647 (8th Cir.1981). Indeed, the Court "remains free to determine the appropriate hourly rate to be paid to an attorney with the skill and experience of [Plaintiff's] counsel, and to determine the number of hours which should be required to competently prepare for and try a case of this type." *Id.* (citing *Brown v. Bathke*, 588 F.2d 634, 638 (8th Cir.1978)).

Plaintiffs have provided documentation indicating that George LaMarca, lead counsel on the case, expended a total of 297.20 hours on the case. His normal hourly fee is $350.00 per hour, for a total claimed lodestar fee of $104,020.00. Justin LaVan, another lawyer who, according to Plaintiff's application, "participated in all phases of this case," claims to have expended 712 hours on the case at a claimed rate of $250.00 per hour, for a total claimed lodestar of $178,000.00. J.J. Dalton, a law clerk at LaMarca & Landry, spent a total of 36.80 hours on the case, at

an hourly billable rate of $150.00 per hour,[3] for a total of $5,520.00. Barbara Bray, a legal assistant spent 3.3 hours on the case, at a rate of $85.00 per hour, for a total of $280.50. Finally, LuAnn Hood, a legal assistant, spent 59.20 hours on the case, at a rate of $85.00 per hour, for a total of $5,032.00. In sum total, the lodestar claimed by Plaintiffs is $292,852.50.

■ Evaluating the *Johnson* factors, the Court first turns to evaluating the reasonableness of the time and labor expended in preparing and litigating Plaintiffs' claims. Defendant urges the Court to reduce any attorneys' fee award by at least $25,875.07 for excessive, redundant and duplicative work. *See Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (applicant for lodestar fee must make a good-faith effort to omit any request for hours that are unnecessary); *Bublitz v. E.I. duPont de Nemours and Co.*, 224 F.Supp.2d 1234, 1250 (S.D.Iowa 2002) (making reduction for duplicative and inefficient efforts). Defendant points to numerous items it claims are unnecessarily billed:

1) In May 2004, George LaMarca spent 3.2 hours, and Justin LaVan spent 3.7 hours preparing for and attending a hearing regarding Plaintiffs' Motion to Compel discovery responses, resulting in a total fee of $2,045. Dennis Johnson, counsel for Saks, spent 2.0 hours preparing for and attending the same hearing, for total fees of $727.48. Defendant requests that Plaintiffs' attorneys' fees be reduced by the difference, or $1,317.52;

2) In October 2004, George LaMarca spent 9 hours, and Justin LaVan

---

**3.** While this is a relatively high fee for a law clerk, Defendant raises no objection to it. Additionally, Mr. Dalton has undergraduate degrees in Accounting, Economics, and Business Administration, as well as a joint MBA/JD degree, and is asserted to have assisted greatly in analysis of some of the financial information in this case.

spent 6.8 hours preparing for and attending the depositions of Mark Barkley, Kendra Sones, and Kathy Williams, resulting in fees totaling $4,850.00. Dennis Johnson spent 9 hours, and Amy Bjork, assistant counsel for Saks, spent .5 hours on the same matters, resulting in fees totaling $3,363.66. Defendant request Plaintiffs' attorneys' fees be reduced by $1,486.34;

3) In November 2004, George LaMarca spent 23.3 hours, and Justin LaVan spent 24.5 hours, preparing for and attending the deposition of Tom Coan in Alabama, resulting in fees of $14,280. Dennis Johnson and Amy Bjork spent 24 hours and 1 hour, respectively, preparing for and attending the deposition of Tom Coan, for total fees of $8,909.31. Defendant requests a reduction of $5,370.69;

4) In January through March 2005, George LaMarca spent 25.3 hours, and Justin LaVan spent 41.4 hours preparing for and attending the deposition of Frank Culp in Naples, Florida, resulting in fees totaling $19,205. Dennis Johnson and Amy Bjork spent 30 hours and 2 hours respectively, and other counsel for Saks, Angela Dralle, spent 2 hours preparing for and attending the same deposition. Total fees for Saks were $11,663.98. Defendant requests a reduction of $7,541.02.

5) Defendant contends that any time dedicated by Plaintiffs' counsel to Marilyn Lashner was unnecessary because none of Dr. Lashner's findings were adopted by the Court or necessary to the case. Specifically, Defendant request that fees be discounted in the amount of $5,234.50 for time dedicated by LaMarca and LaVan to Dr. Lashner.

6) Defendant requests that 2 hours by George LaMarca and 16.9 hours spent by Justin LaVan on an Amended Complaint and in resisting Defendant's Motion to Strike be disallowed, for a reduction of $4,925.

Clerk's No. 103, Def.'s Br. at 4–7.

While evidence of time spent by opposing counsel on certain matters may be helpful in determining whether time spent by Plaintiff's counsel was reasonable expended, *see West v. Aetna Life Ins. Co.*, 188 F.Supp.2d 1096, 1101 (N.D.Iowa 2002), the matter is not so simple as Defendant would make it. The simple fact that defense counsel spent less time on a matter than did Plaintiffs' counsel, does not warrant a finding that Plaintiffs' counsel was frivolous in its time usage. The Court is not inclined to determine as a legal matter that experienced and dedicated counsel in this case frivolously wasted and duplicated time on matters simply because opposing counsel dedicated less time to the same issues. Additionally, the mere fact that counsel devoted time to an expert witness whose conclusions were not ultimately adopted by the Court does not dictate a finding that the time spent was unnecessary.

Having reviewed the time expenditures of Plaintiffs' counsel, and giving due weight to the necessity of permitting counsel to exercise legal strategies as, within reason, they see fit, the Court determines that counsels' claimed hours fall within the bounds of reasonableness and do not reflect wasted or unnecessary duplication of efforts. While ERISA cases are commonly and frequently litigated in federal courts, the vast majority of them involve reviews of decisions by plan administrators involving medical, disability and retirement benefits. The present case presented an unusual factual situation and it is reasonable to conclude that the total hours

expended by Plaintiffs' counsel reflect the normal "twists and turns" of a case as uniquely situated as the present one. Moreover, the Court recognizes that substantial skill is necessary to litigate a class action and that the present case necessarily required a substantial expenditure of time and precluded the attorneys' participation in other cases, at least to some extent.

 Plaintiffs' counsel have presented ample evidence indicating that the requested hourly rates for counsel, law clerks, and legal assistants are reasonable and customary. Opposing counsel, as well as other attorneys in the community charge similar fees, as pointed out in Plaintiffs' supporting documentation.[4] Importantly, while Defendant objects to an award of attorneys' fees in the first instance, it does not appear to quibble with the rates charged by Plaintiffs' counsel and its staff. Courts are to look to the marketplace as a guide in determining what is a "reasonable" attorney fee. *Missouri v. Jenkins*, 491 U.S. 274, 285, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989); *Blum v. Stenson*, 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (reasonableness of requested rates is to be determined with reference to rates prevailing in the community for similar services by at-

torneys of comparable skill, experience, and reputation). "In addition, when fixing hourly rates, courts may draw on their own experience and knowledge of prevailing market rates." *Warnock v. Archer*, 397 F.3d 1024, 1027 (8th Cir.2005) (finding $200 per hour constituted a reasonable hourly attorney fee where lawyers were highly experienced and noting "that in another appeal we recently approved an hourly rate of $250" and that "nearly ten years ago we affirmed an Arkansas district court's use of a $200 per hour rate to calculate a fee award") (citing *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1330 (8th Cir.1995)). While the Court is supposed to draw upon its own experiences regarding "reasonableness" of rates and of hours, it is noted that an hourly rate by a 1998 graduate from law school (Mr. LaVan) of $250.00 seems extraordinary to the Court, but no objection to that rate, nor any of the other rates has been made by Defendant.

 Also relevant to the reasonableness of the requested fee is the fact that Plaintiff's counsel accepted this case on a contingency fee basis of 40%. Counsel has provided numerous affidavits of Plaintiffs' class members stating that they have no objection to counsel receiving such a con-

---

**4.** A recent article in the National Law Journal recently conducted a survey of 116 of the nation's largest law firms. *See* Lindsay Fortado, *Hourly Billing Rates Continue to Rise*, The National Law Journal (12–12–2005). The article discusses the trend that both partner and associate salaries are continually on the rise. Of those surveyed, the highest partner rate was $1000.00 per hour, according to the legal consulting firm of Altman Weil in Philadelphia. *Id.* The highest associate rate was paid by defense council's firm, Dorsey & Whitney, at a rate of $835 per hour in its United Kingdom tax litigation division. The lowest rates charged for associates in the last two years ranged from $75.00 per hour to $90.00 per hour, while the lowest rate charged for

partners over that time ranged from $105.00 per hour to $135.00 per hour. Interestingly, there seems to be a growing group of detractors to the billable hour, regardless of the rate charged. *See* Douglas McCollam, *The Future of Time; Almost Everyone Agrees that the Billable Hour is the Scourge of the Legal Profession. So why is it still around?* The American Lawyer, (October 2005) (discussing the perils of the billable hour system, its origins, and alternatives, and noting that a report issued by the American Bar Association in 2002 "fingered the billable hour system for a host of perceived ills in the [legal] profession, including bill padding, associate defections, and the dearth of pro bono work.").

tingency fee. Generally, contingent fee agreements reflecting a twenty-five or thirty-three and one-third percent recovery is the norm in this community. Perhaps there were reasons that a 40% recovery was agreed upon in this case that is not apparent to the court. In any event, the Court will presume that the employing of Plaintiffs' firm on such a high contingency percentage was an arms-length transaction and reflects the prevailing market rates for ERISA class action work. Despite the forty percent contingency agreement with Plaintiffs, counsel has requested what amounts to 35% of the total judgment with interest in this case. Naturally, by agreeing to take the case on a contingency fee basis, counsel took a substantial risk that no money would ever be recouped for their services in this case, as Plaintiffs were under no obligation to pay counsel should their claims have failed in their entirety.

 "The most important factor in determining what is a reasonable fee is the magnitude of the plaintiff's success in the case as a whole." *Jenkins v. State of Missouri*, 127 F.3d 709, 716 (8th Cir.1997). "If the plaintiff has won excellent results, he is entitled to a fully compensatory fee award, which will normally include time spent on related matters on which he did not win." *Id.* In the present case, Plaintiff's counsel ably and competently litigated their ERISA claim. Both attorneys have outstanding resumes and clearly were well prepared for trial and experienced in this type of litigation. Despite the Court's dismissal of state law claims and an unfavorable grant of summary judgment on Plaintiffs' breach of fiduciary duty claim, the Plaintiff class received a judgment of over $1.6 million, a result that can be deemed nothing less than a substantial victory.

 Having considered the *Johnson* factors, the Court finds that the requested lodestar fee of $292,852.50 is reasonable under the facts of this case. The Court now turns to Plaintiffs' request that a multiplier of 2.19 by employed to increase the award. "The burden of proving that such an adjustment is necessary to the determination of a reasonable fee is on the fee applicant." *Blum*, 465 U.S. at 898, 104 S.Ct. 1541. The lodestar award is presumptively a reasonable fee, and most factors relevant to determining the amount of a fee are subsumed within the lodestar amount. For example, there is a "strong presumption" that "the 'results obtained' from the litigation" are reflected in the time and rate calculations of the lodestar figure. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) ("*Delaware Valley I*") (quoting *Blum*, 465 U.S. at 898, 900, 104 S.Ct. 1541). Likewise, "[n]either complexity nor novelty of the issues ... is an appropriate factor in determining whether to increase the basic fee award." *Blum*, 465 U.S. at 898–99, 104 S.Ct. 1541. Enhancement is reserved for "rare" and "exceptional" cases and must be supported by specific evidence in the record and detailed findings by the district court. See *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 727–28, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) ("*Delaware Valley II*"); *Delaware Valley I*, 478 U.S. at 565, 106 S.Ct. 3088.

 On the present facts, the Court cannot find that an enhancement of the lodestar is warranted. "The applicant [for a fee enhancement must] establish that the quality of service rendered and the results obtained were superior to what one reasonably should expect in light of the hourly rates charged and the number of hours expended." *In re Apex Oil Co. v. Palans*,

960 F.2d 728, 732 (8th Cir.1992). Here, Plaintiffs' counsel did a very good job of prosecuting their case, however, the Court cannot say that their performance was sufficiently "superior" to what would have been expected had they taken the case on a pay-as-you-go basis. As pointed out by Defendant in their Brief regarding the attorneys fees request by Plaintiffs, "Class Plaintiffs' attorneys did not articulate the legal argument that prevented Saks from succeeding on its motion for summary judgment and that later, contributed to Plaintiffs' success at trial." This allegation by Defendant has not been challenged factually by Plaintiffs by way of a Reply or other pleading, and the Court, therefore, accepts it as true for purposes of considering an increase in the normal lodestar entitlement. Plaintiffs' counsel never personally raised the theory of recovery on which they ultimately prevailed. Indeed, had the Court not concluded, sua sponte, that the October 27, 2000 Letter was a faulty SPD, Summary Judgment on the ERISA claim would have been granted in favor of Defendant. This is not to diminish the fine work done by Plaintiffs' counsel on behalf of their clients, but certainly negates a finding of superior performance, absent any other evidence supporting such a conclusion.[5] Defendant also claims in its Brief that Plaintiffs' counsels' work expenditure in terms of their time was inefficient and duplicative. While it is always tempting to look back at a lawyers' work and be critical of the way counsel spent their time, it is not reasonable for Courts to do so. Lawyers must exercise judgment in determining what kind of work to do in developing their claims or defenses legally and factually. Courts should forego the opportunity to second guess such decisions.

Under the fee-shifting provisions of ERISA, therefore, the Court orders Defendant to pay $292,852.50 towards Plaintiffs' attorneys fees in this matter. No multiplier is appropriate on the facts of this case and none is awarded.

### B. *Litigation Expenses*

Plaintiff request $36,351.67 in litigation expenses. This amount subsumes the $6,239.43 previously requested in Plaintiffs' Bill of Costs, and includes expenses for fees of the clerk, marshal, witnesses

---

**5.** Plaintiffs' counsel spends a great deal of time discussing the contingency nature of the case and emphasizing the risk it undertook, and regularly undertakes, in representing class actions on a contingency fee basis. The Court is impressed by LaMarca & Landry's commitment to taking a certain number of cases, particularly class actions, on a contingency fee basis, and commends their actions. However, in light of the Supreme Court's *Dague* decision, and subsequent law within the Eighth Circuit, the Court must presume that counsel has compensated for the risk involved by the hourly fee submissions made in support of the lodestar amount. While the Court recognizes the inherent risk of taking cases on a contingency fee basis, it is confident that the hourly rates charged by counsel and factored into the lodestar amount are more than ample to compensate, at least as a matter of fee-shifting to the opposing party, for the time expended on the present case.

As the articles cited in footnote 3 indicate, hourly billing rates for attorneys have been on the rise year after year. Unfortunately, the average, non-corporate client, is completely unable to afford such rates, particularly when they are required to pay each and every expense as well. The concern, of course, is that average persons are being denied access to the courts for their inability to pay legal fees. Meanwhile, law firms are seeing ever increasing profits and shifting more and more of their expenses, once deemed part and parcel of running a law office, to those persons most in need of services, but least able to pay. Fee shifting statutes such as the one used in this case are part of the Congressional attempt to assure some access, albeit limited, by consumers (non corporate citizens) to the legal system. While Plaintiffs counsel has made much of the contingent fee as providing access, fee shifting statutes are the primary way ERISA claims are compensated.

and court reporter, fees for photocopying, and miscellaneous other expenses. Defendant concedes that certain of these costs are recoverable, but object to both the adequacy of the documentation supporting the requested expenses, and the amounts thereof.

ERISA authorizes a court "in its discretion" to allow "costs of action to either party." 29 U.S.C. § 1132(g)(1). Likewise, Federal Rule of Civil Procedure 54(d) provides that "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs." Fed.R.Civ.P. 54(d). Costs routinely chargeable under 28 U.S.C. § 1920 are generally recoverable by the prevailing party in an action such as this one. *See Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 442, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987). Such costs include the fees of the clerk and marshal, fees of the court reporter for transcripts necessarily obtained for use in the case, fees and disbursements for printing and witnesses, fees for exemplification and copies necessarily obtained for use in the case, docket fees, and compensation for certain experts and interpreters. *See* 28 U.S.C. § 1920.

■ Additionally, reasonable out-of-pocket expenses incurred by an attorney which typically would be charged to a fee-paying client are includable in a statutory award of attorneys' fees. *See Pinkham v. Camex, Inc.*, 84 F.3d 292, 294–95 (8th Cir. 1996) (citing *West Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 87 n. 3, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991); *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1216 n. 7 (9th Cir.1986); *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4, 30 (D.C.Cir.1984); *Northcross v. Board of Educ.*, 611 F.2d 624, 639 (6th Cir.1979)). Such expenses routinely include costs for

long distance telephone calls, facsimiles, express mail and postage, messenger services, and reasonable travel expenses. *See Pinkham*, 84 F.3d at 295 (costs for long distance, faxes, messenger and express mail are expenses normally charged to clients); *Kelly v. Bowen*, 862 F.2d 1333, 1335 (8th Cir.1988) (telephone calls, postage, and air courier costs normally billed); *Int'l Woodworkers of Am., AFL–CIO v. Donovan*, 792 F.2d 762 (9th Cir.1986) (recognizing that fee statutes generally provide for recovery of costs "ordinarily billed to a client"); *Northcross*, 611 F.2d at 639 (reasonable photocopying expenses are recoverable).

■ Plaintiff first requests $132.77 as "Fees of the Clerk." Defendant does not dispute that Plaintiff is entitled to recover the $100.00 filing fee Plaintiffs incurred for filing the case in the Iowa District Court in and for Polk County, Iowa. Defendant does, however, urge the Court to disallow $11.10 claimed by Plaintiffs as Courtwatch fees, as well as $21.67 incurred for access to the Court's PACER (Public Access to Court Electronic Records) files. Plaintiff has not presented any authority indicating that access to Courtwatch and PACER are recoverable as fees of the clerk. Neither Courtwatch nor PACER were mandatory in this Court at the time of the claimed submissions. Accordingly, the court grants only $100.00 in "Fees of the Clerk" as costs. In light of the fact, however, that the Court has taken great pains to involve the legal community in its efforts at electronic filing and electronic court record access,[6] and because this type of expense is one that attorneys routinely would pass along to clients, the Court will allow the additional $32.77 as an addition to attorneys' fees.

---

6. Indeed, registration and filing with the Court's CM/ECF system is now mandatory.

■ Next, Plaintiffs request "Fees of the Marshal" in the amount of $170.00.[7] This figure represents $35.00 paid to Larry Dorsey, $50.00 paid to South Florida Legal Services, and $85.00 paid to Mid South Legal for process service of the original notice and Complaint on various persons. While numerous circuit courts that have addressed the issue of payment for private process servers have permitted such costs to be recovered under § 1920, *see United States E.E.O.C. v. W & O, Inc.,* 213 F.3d 600, 624 (11th Cir.2000) ("We hold that private process server fees may be taxed pursuant to §§ 1920(1) and 1921."), *Collins v. Gorman,* 96 F.3d 1057, 1060 (7th Cir.1996) ("[W]e think it best to resolve the ambiguity of § 1920 in favor of permitting the prevailing party to recover service costs that do not exceed the marshal's fees, no matter who actually effected service."), *United States for Use and Benefit of Evergreen Pipeline Const. Co., Inc. v. Merritt Meridian Const. Corp.,* 95 F.3d 153, 173 (2d Cir.1996) ("[T]he court believes the taxation of costs for special process servers is justifiable."), *Alflex Corp. v. Underwriters Labs., Inc.,* 914 F.2d 175, 178 (9th Cir.1990) (We also hold "that private process servers' fees are properly taxed as costs."), the Eighth Circuit Court of Appeals has held the contrary. In *Crues v. KFC Corp.,* 768 F.2d 230, 234 (8th Cir.1985), the Court of Appeals disallowed $250.00 for use of a special process server because such expenses were not explicitly permitted by § 1920. Accordingly, the Court will not grant permit the requested $170.00 as costs. Because, however, the amount is one that is customarily billed to clients, the Court will add the requested $170.00 to Plaintiffs' award of attorneys' fees.

In their Bill of Costs, Plaintiffs requested $2,943.41 for fees of the court reporter for transcripts necessarily obtained for use in the case. Concurrently with submission of the Bill of Costs, Plaintiffs provided documentation of the following expenses:

1) $271.45 to Launspach, Lewis, Burns & Kluender, Inc. ("Launspach") for a job dated 7/28/04;

2) $230.15 to Launspach for transcripts of Kathy Rae Williams and Kendra Joan Sones;

3) $411.20 to Foshee & Turner for an original and one certified copy of the transcript of R. Thomas Coan;

4) $644.07 to Collier Reporting Service, Inc. for the videotaped and transcribed deposition of Frank Culp;

5) $437.55 to Launspach for deposition transcripts of Susan Reoboltman, Dena Steinbach, Marleen Dixon, Jennifer Ladehoff, Suzanne McLellan, and Connie Ward;

6) $176.70 to Launspach for copies of the transcripts of Julie Hamilton, Emily Toth, Dannette Holliday, Linh Phanthavong, and Sara Biris;

7) $133.04 to Launspach for transcripts of Cheryl Womack, Darlene Owens, Michele Barber, and Tosha Whitson;

8) $262.05 to Launspach for transcripts of Terry Montgomery and Anne Golke (amount includes an "expedited fee" of $49.60);

9) $304.60 to Launspach for transcript of Mark Barkley;

10) $72.60 to Peterson Court Reporters for a copy of the transcript of a hearing held before United States Magistrate Judge Shields on 5/27/04;

---

7. Plaintiffs' Bill of Costs lists the amount as $160.00, however, the itemized expenses total $170.00.

In their resistance to Plaintiffs' Bill of Costs, Defendant appears to object only to the final submission, $72.60 to Peterson Court Reporters. As noted, the transcript obtained was that of a Motion to Compel hearing held by Judge Shields. Defendant correctly points out that Plaintiffs did not, in their Motion for Summary Judgment or during trial, cite to the contested transcript, nor have Plaintiffs otherwise demonstrated that the transcript was "necessarily obtained for use in the case." Accordingly, the Court will permit only $2,870.81 for court reporter fees articulated in Plaintiffs' Bill of Costs. Since filing their bill of costs, Plaintiffs now request an additional $1,579.60 for payment to Peterson Court Reporters on October 10, 2005. Plaintiffs have not provided any documentation supporting the basis for this claim. The Court finds, however, it is almost certain, given the timing and the total expense, that the expense is for a copy of the trial transcript, necessary for use in post-trial motions. Accordingly, the Court will permit the expense, discounted by 10%, or $157.96, for failure of documentation.

Plaintiffs' Bill of Costs next requested $74.25 for "fees for witnesses," specifically $45.25 to Thomas Coan for a witness fee and mileage, and $29.00 to Frank Culp. Defendant has not expressed any objection to these items and they are supported by documentation attached to Plaintiffs' Bill of Costs demonstrating that they were customary and ordinary fees and expenses. Accordingly, $74.25 is permitted for "fees for witnesses."

■ Plaintiffs request $2,518.31 for Westlaw research fees and expenses. It is well settled in the Eighth Circuit that "computer-aided research, like any other form of legal research, is a component of attorneys' fees and cannot be independently taxed as an item of cost in addition to the attorneys' fee award." *See Leftwich v. Harris–Stowe State College,* 702 F.2d 686, 695 (8th Cir.1983). Accordingly, the Court concludes that Plaintiffs cannot recover the requested fees expended on computer-aided research.

■ Plaintiffs request $150.00 for "supplies and forms." The Court believes that this item is part of the cost of operating a law practice and not an "expense" that can be recovered from Defendant under the fee-shifting statute in this case. Accordingly, the expense is not recoverable.

■ Plaintiff request $5,950.00 for payment to Dr. Marilyn Lashner. In support of an award of fees for Dr. Lashner's services, Plaintiffs state the following:

While we did not use the services of Marilyn Lashner, Ph.D. at trial, she was very instrumental in providing ideas, resources and an expert grammatical and syntax analysis of the language of the October 27, 2000 letter, both as written and as it would have been understood in the context of the circumstances existing at Saks Inc. when it was disseminated. She provided an Affidavit that was used in support of Plaintiffs's Cross Motion for Summary Judgment and in Resistance to Saks' Motion for Summary Judgment.

There were several issues put in direct dispute by Saks Inc. and upon which Dr. Lashner was able to provide assistance. First, with regard to ERISA law that a SPD "shall be written in a manner calculated to be understood by the average plan participant," she provided research, insight and argument as to why the term "change of control" in its "ordinary, and not specialized meaning" would include an internal divisional consolidation. Second, Saks took the position, as found by the Court on page 10 of

its Ruling, "that the term was ambiguous," and thus put both the meaning and usage of the term "change of control" in direct issue in this case. After the Court's Ruling on the Cross–Motions for Summary Judgment, it was felt that it was not necessary to have Dr. Lashner testify at trial. This, however, was not a decision that could have been safely made before the Court's summary judgment ruling.

Pls.' Combined App. for Attorneys' Fees and Expenses, Attach. 1 at 9. Plaintiffs also seek an award of $6,220.00 to recover expenses paid to Media Analysis & Communications Research ("Media Analysis"), the apparent employer of Dr. Lashner. Defendant counters that Dr. Lashner's analysis of the term "change of control" was not necessary to the Plaintiffs' lawsuit because this Court did not adopt her analysis in its ruling on the parties' Motions for Summary Judgment, adopting instead the Plaintiffs' definition of "change of control."

Title 28, United States Code, § 1820 provides generally for taxing costs of witnesses, permitting $40 per day for attendance, reimbursement for actual travel expenses, and a per diem which varies by judicial district. Numerous courts have determined that ERISA does not specifically permit fee-shifting for expert witness fees, and therefore the limitations provided in 28 U.S.C. § 1821 are applicable to expert witness expenses. *See e.g., Agredano v. Mutual of Omaha Companies,* 75 F.3d 541, 542 (9th Cir.1996); *Holland v. Valhi Inc.,* 22 F.3d 968, 979–80 (10th Cir.1994); *Emmenegger v. Bull Moose Tube Co.,* 33 F.Supp.2d 1127, 1136 (E.D.Mo.1998) ("ERISA's fee-shifting provision, 29 U.S.C. § 1132(g), refers only to 'a reasonable attorney's fee and costs of action.' It contains no mention of expert fees and thus does not authorize a court to award such fees in excess of § 1821's limits.").

Plaintiffs have offered no contrary authority under which it may recover extensive expenses for expert witness fees in the context of this case. Indeed, the fees for Dr. Lashner and her employer total $12,170.00. Plaintiff has provided absolutely no documentation indicating the billable rate for Dr. Lashner or Media Analysis' services, nor any itemization of services performed by Dr. Lashner or Media Analysis and the time involved therein. Even were the Court to find that it had the authority to shift costs for expert witness fees in this case, it simply could not given the utter lack of supporting authority and documentation. Indeed, the Court is unable to even authorize, at this juncture, a daily fee under § 1821, due to the lack of documentation. The expenses requested for Dr. Lashner and Media Analysis are, therefore, not recoverable as costs in this action. In light of the fact, however, that expert witness fees are the type of expense normally passed on to clients, and because the Court has seen the work product submitted by Dr. Lashner, the Court will permit the fees of Dr. Lahsner as an addition to the attorneys' fees, discounted by 15%, or $595.00 for poor documentation. As the Court has not been provided any information whatsoever to determine the validity or necessity of payment to Media Analysis, that cost remains disallowed both as a cost and as a component of attorneys' fees.

Plaintiffs next assert $3,427.89 in travel expenses for George LaMarca and Justin LaVan. These expenses include $80.00 in petty cash for travel on November 12, 2004, airline expense of $70.00 on December 6, 2004, $105.00 for "Travel" on December 31, 2004, $583.14 for an apparent hotel expense at the Crowne Plaza on January 1, 2005, a travel expense recovery of $51.40 on January 1, 2005, airline travel on

Northwest Airlines on February 15, 2005 of $694.50, $250.00 on February 23, 2005 regarding "Sheri Cunningham,"[8] rental car and parking expenses on March 2, 2005 of $406.06, and airline, parking and hotel fees of $1,187.79 on April 6, 2005 to Naples, Florida. In the affidavit of George LaMarca, filed as Attachment 1 to Plaintiffs' motion, counsel states that it had to travel to Naples, Florida to depose Frank Culp and to Tennessee to depose Tom Coan. Defendant has not filed any specific objection to the travel expenses incurred by Plaintiffs counsel in this matter, and the Court finds that travel to depose witnesses in this case was reasonable and necessary and is the type of matter normally billed to clients. Accordingly, the cost is recoverable. Nonetheless, it is unclear why $250.00 in travel expenses would be expended for Plaintiffs' counsels' bookkeeper, and the amount is, therefore, disallowed, bringing the recoverable expenses to $3,177.89. Additionally, because Plaintiffs' counsel has not properly filed documentation in support of their request for travel expenses, such as copies of receipts or itemization of the requested expenses, the Court discounts the recoverable amount by 15%, or $476.68, for total recoverable travel expenses of $2701.21.

Plaintiffs request $130.35 in fax charges, $46.26 for Federal Express charges, $77.84 in mileage expenses, $71.30 in long distance phone charges, $267.55 for postage, and $81.17 in UPS shipping charges, for a total of $674.47. Again, Defendant has not specifically objected to these charges and the Court finds them to be reasonable and customary. Nonetheless, due to the failure of documentation of the claimed expenditures, the Court discounts the expenses by 15%, or $101.17 for a total recoverable expense of $573.30.

The remainder of expenses requested by Plaintiff are as follows:

1) $30.00 to the American Bar Association;

2) $3.00 to the Department of Labor;

5) $7.95 for Capital One "Intelius";

6) $280.00 for "Julie Hamilton";

7) $1,364.33 to Martin Consulting;

9) $4.55 for "Pay statement";

12) $281.58 to Pro Copy for DVD to MPEG conversion;

15) approximately $10,500.00 for photocopies.

With only one exception, a receipt from Pro Copy showing DVD to MPEG conversion, Plaintiff has provided absolutely no documentation itemizing or supporting the expenses listed above. Regarding the receipt provided from Pro Copy, the Court will accept counsel's assertion that the MPEG conversion was for documents necessarily obtained for use in the case. The Court will again, however, discount the permissible amount by 15%, or $42.24 for poor documentation, for a recoverable expense of $239.34. A review of the witness list shows that Julie Hamilton testified telephonically at trial for approximately 20 minutes, however, Plaintiffs have not demonstrated the purpose for a $280.00 payment. The Court will, therefore, authorize only a $40.00 witness fee pursuant to § 1821.

■ The remaining expenses to the American Bar Association, the Department of Labor, Capital One, Martin Consulting, and "Pay statements" are wholly undocumented and the Court can find no assertion in the record that these expenses were necessarily incurred or any authority to permit their recovery as litigation costs or

---

**8.** Sheri Cunningham is the bookkeeper at the law firm of Plaintiffs' counsel, LaMarca & Landry, P.C. *See* Attachment 5 of Plaintiffs' Motion.

attorneys' fees. Accordingly, these expenses will not be awarded to Plaintiffs. Finally, Plaintiffs have requested approximately $10,500 in photocopy fees, not including the fees of Pro Copy, included in Plaintiffs' initial request in their Bill of Costs for $2,929.00 in photocopy fees. Plaintiffs filed an 81 page itemization of expenses with over 3,000 entries devoted solely to photocopies, ranging in price from $.28 to $480.20. As Defendant points out, there is no indication in any of Plaintiffs' pleadings regarding the price charged per page copied, the number of pages copied, or what was copied and its relevance and necessity to the present case. Indeed, the only reference made by Plaintiffs in justification of the expenses was in Plaintiffs' Bill of Costs where it was noted: "Fees for ... copies of papers necessarily obtained for use in the case were requested only for exhibits used at depositions, discovery documents produced to opposing counsel and copies for filing with court and for use at trial." It is unclear whether this assertion applies only to the $2,929.00 requested in the Bill of Costs, or to the entire $10,000.00 plus amount now requested as recoverable expenses. Upon review of Plaintiffs' photocopying expenses, the Court believes it likely that Plaintiffs' counsel charged $.28 per page photocopied. This amounts to well over 37,500 pages copied. There was not a tremendous amount of documentary evidence in this trial and the Court is hard-pressed to find that such voluminous copying charges could possibly be reasonable or necessary. Moreover, this Court finds that a rate of $.28 per page is excessive. To the extent the Court permits any of the claimed photocopying expenses, it will be only at the reduced, and more reasonable, rate of $.15 per page.

While the Court does not doubt counsel's veracity in listing the various photocopying expenses, despite the failure of documentation of the necessity of such charges, the Court's familiarity with the case and knowledge of the record and evidence revealed at trial leads it to believe that the charges are grossly overstated, at least in regards to expenses that should be shifted to the opposing party. Various courts have adopted penalties to address a failure of documentation on an item of this magnitude. At least one court has discounted the permissible amount, *see e.g., Rural Water System # 1 v. City of Sioux Center, Iowa,* 38 F.Supp.2d 1057, 1068–70 (N.D.Iowa 1999), while at least one other has denied the expenses, *see Emmenegger,* 33 F.Supp.2d at 1133. Defendant urges the Court to deny the expense, as did the *Emmenegger* court, which held: "[T]he photocopy expenses ... incurred in copying [a party's] own pleadings and motions for filing with the Court, serving on opposing counsel, or transmitting to their clients [are not recoverable]; nor does the cost statute cover a party's copying of documents to be produced in discovery, or copying research materials for the convenience of counsel." *Id.* The *Emmenegger* Court concluded that "[b]ecause plaintiffs have failed to segregate their properly taxable photocopying costs, none of the photocopying charges that they claim will be taxed as costs." *Id.* Defendant fails to note, however, that the *Emmenegger* Court, though it denied the photocopying expenses as costs, awarded them in their entirety as part of reasonable attorneys' fees in the action. The Court will adopt a combined approach of the *Emmenegger* and *Rural Water* courts here. Given the nature, facts, and evidence in the case, however, the Court cannot find any justification for over 37,000 photocopies to have been made. Rather, the Court will permit 18,000 photocopies, at a cost of $.15 each, for a total recoverable photocopying expense of $2,700.00. The amount will be

added to the attorneys' fee in this matter and will not be taxed as a cost due to the failure of documentation.

Accordingly the Court hereby orders the Clerk of Court to tax as costs $8,020.55, representing the following expenses:

1) $100.00 for fees of the clerk;

2) $4,292.45 for Court Reporter fees;

3) $74.25 for witness fees;

4) $2,701.21 in travel expenditures;

5) $573.30 for mileage and shipping and postage expenses;

6) $239.34 for Pro Copy copy expenses;

7) $40.00 for a testifying witness fee for Julie Hamilton.

An additional $8,257.77 will be added to the attorneys' fee award representing:

1) $32.77 in Courtwatch fees;

2) $170.00 in service of process fees;

3) $5,355.00 for payment to Dr. Lashner;

4) $2,700.00 in photocopying costs.

## C. *Fee for Class Representatives*

Plaintiffs finally request that Defendant be required to pay $5,000.00 each to the named Plaintiff class representatives for their devotion of "substantial time to review pleadings, meet with counsel, provide information, respond to written discovery, testify in discovery depositions, and testify at trial." Pls.' Br. at 22. Defendant resists the request, pointing out that none of the representative Plaintiffs have submitted any documentation detailing the amount of time spent on the case, or describing their effort in pursuing the case. The only case cited by Plaintiffs in support of their request is an unpublished case, *Berger v. Xerox Corp. Ret. Income Guar. Plan*, 2004 WL 287902 (S.D.Ill. Jan.22, 2004), which approved a fee for class representatives in the context of a settlement of class litigation. Because Plaintiff has

failed to provide any authority or documentation supporting the request for representative fees, the Court has no choice but to deny it.

## III. CONCLUSION

For the reasons stated herein, "Plaintiff's Motion for Attorney Fees and Expenses" (Clerk's No. 94) is granted in part and denied in part, consistent with this order. The Clerk of Court is directed to tax as costs against the Defendant $8,020.55. Under the ERISA fee-shifting statute, Defendant shall pay $292,852.50, plus an additional $8,257.77 in attorneys' fees, for a total of $301,110.27.

IT IS SO ORDERED